2004 VT 99

# State of Vermont v. Tashia Lee Beer

[864 A.2d 643]

Nos. 02-536 and 03-456

Present: **Amestoy, C.J.,\* Dooley, Johnson and Reiber, JJ., and Allen, C.J. (Ret.),
Specially Assigned**

Opinion Filed October 1, 2004

---

\* Chief Justice Amestoy sat for oral argument but did not participate in this decision.

*Robert Butterfield,* Caledonia County State's Attorney, St. Johnsbury, for Plaintiff-Appellant (02-536) and Plaintiff-Appellee (03-456).

*William A. Nelson,* Middlebury, and *Pamela A. Marsh* of *Marsh & Wagner,* Middlebury, for Defendant-Appellee (02-536) and Defendant-Appellant (03-456).

¶ 1. **Reiber, J.** Defendant Tashia Beer has been charged with first degree murder in the February 2000 slaying of her stepmother. In these consolidated interlocutory appeals, we consider whether the trial court erred in granting defendant's motion to suppress statements that she made to police on the morning of the murder, and denying her motion to dismiss on speedy trial and due process grounds. The State challenges the ruling on the motion to suppress, arguing that the court erred in finding that defendant was subject to an illegal "de facto arrest" on the morning of the murder, and that she was subjected to "custodial interrogation" by police officers. Defendant challenges the court's denial of her motion to dismiss, arguing that her speedy trial and due process rights were violated by the twenty-six month delay between her "de facto arrest" in February 2000 and her indictment for first degree murder in April 2002. We affirm both orders.

¶ 2. The trial court made the following findings. On February 16, 2000, at approximately 8:30 a.m., defendant's father, Randy Beer, called police to report that Scott Favreau, his foster son, had shot his wife. Beer stated that Favreau had fled with defendant, who was fourteen at the time, in a red Isuzu. Detective Dante Annicelli, the principal investigating officer, received word that the shooter had taken "a child." Shortly thereafter, Detective Annicelli spotted the vehicle, and observed two passengers in the car. He followed the car, and called for backup.

¶ 3. After a high speed chase, the vehicle was stopped at a roadblock. There were approximately twenty police officers at the roadblock, and at least fifteen police vehicles with their lights flashing and sirens running. Officers drew their guns and pointed them at the vehicle's occupants. Both Favreau and defendant were ordered out of the car and down on the ground. Defendant got out of the car, but she did not

comply with the second command. Instead, she said, "Me? Why me?" Police again ordered her to get down. When she complied, she was immediately handcuffed with her hands behind her back. She was lying face-down for less than two minutes while she was patted down for weapons.

¶ 4. Favreau was formally arrested at the roadblock, and driven to the police barracks. At the roadblock, he stated to police, "It was all me. She had nothing to do with it." Police transported defendant to the police barracks to obtain information about the homicide. Defendant appeared calm and collected. She was not questioned during the ride, but she volunteered the statement, "Who called? I bet it was my Dad." After arriving at the police barracks, defendant initially remained in handcuffs, and she was placed in a room with a uniformed officer stationed just outside. Sergeant Leo Bachand, the police officer in charge of the scene, and State's Attorney Dale Gray believed that defendant had possibly been a hostage. They did not discuss whether defendant should be given *Miranda* warnings, nor did they arrange for an independent interested adult to be present to advise her.

¶ 5. Detective Annicelli and Detective Sergeant Martin Hatch were assigned to interview defendant. They intended the interview to be informal and conversational; they sought to obtain information, rather than conduct a formal interrogation designed to obtain incriminating statements. Both Detective Annicelli and Detective Sergeant Hatch believed that it was unnecessary to advise defendant of her *Miranda* rights or secure the presence of an independent interested adult because defendant was considered a material witness, not a suspect.

¶ 6. At approximately 10:00 a.m., Detective Annicelli and Detective Sergeant Hatch conducted a "pre-interview" discussion with defendant. This interview was not tape-recorded, although the officers took notes. The officers removed defendant's handcuffs, and offered her food, drink, and an opportunity to go to the bathroom. The officers were not in uniform during the interview, although both wore their sidearms. The room in which defendant was interviewed was approximately ten by fifteen feet with a window. Detective Annicelli sat at a desk facing defendant; defendant sat approximately four to five feet away on the other side of the desk. Detective Sergeant Hatch sat next to defendant, about three feet away. The door to the office was closed.

¶ 7. During the interview, defendant appeared calm and collected. Neither officer noticed any signs that she was impaired or unable to understand what was happening. The officers knew that she was fourteen years old. Detective Annicelli was the lead interviewer. He

informed defendant that they thought she was a witness to her stepmother's murder, and they needed her to "provide information" and "clarify" the morning's events. Defendant appeared willing to talk. The officers informed defendant that their purpose was to get information "to piece together what had happened."

¶ 8. During the interview, defendant engaged in an essentially uninterrupted narrative. The officers then asked some specific follow-up questions, including whether defendant had spoken to Favreau and her classmates about killing her stepmother. They also asked her about the presence of her fingerprints on the murder weapon. The same process was then repeated on tape. The recorded interview concluded at approximately 11:00 a.m. At that time, the officers again offered defendant food, drink, and an opportunity to use the restroom. Defendant remained calm, almost "upbeat."

¶ 9. Later that afternoon, at approximately 4:00 p.m., defendant's father arrived at the police barracks. He informed police that he did not want defendant to return home. An emergency detention order was obtained based on an allegation that defendant was a child in need of care and supervision (CHINS) pursuant to 33 V.S.A. § 5502(a)(12)(A). Defendant was transferred to the custody of the Department of Social and Rehabilitation Services (SRS) sometime after 6:45 p.m. that evening.

¶ 10. The next day, the State moved to have defendant held as a material witness pursuant to 13 V.S.A. § 6605 in the criminal case pending against Favreau. That same day, the family court held a detention hearing, and it continued temporary custody and guardianship with SRS pending a merits hearing. The family court issued a flexible order for placement at Woodside Juvenile Rehabilitation Center, which was scheduled for review on February 22, 2000. Woodside is a juvenile rehabilitation center that is operated by SRS as a secure detention and treatment facility for juvenile offenders. See 33 V.S.A. § 5801(a).

¶ 11. On February 22, 2000, the district court held a hearing on the State's motion to detain defendant as a material witness. Pursuant to a stipulated agreement between the parties, the district court granted the State's motion. Defendant stipulated that she was a material witness, and the parties agreed to certain conditions of recognizance, including the posting of a $10,000 appearance bond. Defendant did not post this bond.

¶ 12. That same day, at a status conference in the CHINS proceeding, the family court continued guardianship and custody of defendant in SRS. Defendant's attorney indicated that defendant was aware that, given the terms of her stipulation in the material witness proceeding, she would likely be placed at Woodside. By agreement between the Department of Corrections and SRS, defendant was placed at Woodside.

¶ 13. The family court held a merits hearing in March 2000. Defendant, through her attorney, admitted that she was CHINS pursuant to 33 V.S.A. § 5502(a)(12)(C). The family court accepted defendant's admission, and it made findings based on the parties' stipulation that defendant was CHINS. SRS filed a disposition report and case plan in May 2000. Defendant objected to the case plan, asking that she be placed with her aunt and uncle rather than at Woodside. She did not object to being placed in SRS custody. After a disposition hearing in July 2000, the family court accepted the SRS case plan, and continued SRS custody and guardianship. The court concluded that SRS had established by clear and convincing evidence that it should have custody of defendant, and its plan served defendant's best interests. At a permanency planning hearing in January 2001, defendant did not object to SRS's case plan, and the court adopted it and continued custody in SRS.

¶ 14. In August 2001, defendant moved to vacate the court's February 2000 order detaining her as a material witness. The district court granted defendant's request on October 5, 2001, but stayed its order until October 30. On October 30, the family court held a juvenile disposition hearing. The court continued defendant in SRS custody and guardianship, and all parties agreed that defendant would be placed at The Pines, a residential treatment center in Virginia. A permanency planning hearing was held in January 2002. At the hearing, defendant's counsel stated that the case plan was appropriate. Defendant remained at The Pines until she was indicted for first degree murder on April 17, 2002.

¶ 15. Shortly after she was indicted, defendant moved to suppress the statements that she had made to police on the day of the murder, and to dismiss the case against her on speedy trial and due process grounds. After several evidentiary hearings, the court granted defendant's motion to suppress in a November 2002 order. The court concluded that defendant's statements should be excluded because they were the product of an illegal de facto arrest. The court found that defendant had been in police custody from the moment that the Isuzu

was stopped and she was handcuffed, and she was kept in custody for the remainder of the day, all without the issuance of an arrest warrant or sufficient grounds to sustain probable cause to hold her for any suspected crime.

¶ 16. The court also concluded that defendant's statements should be suppressed because she had been subjected to "custodial interrogation" without being advised of her *Miranda* rights. The court explained that defendant was "in custody" for purposes of *Miranda* at the time that she was interviewed by police because her freedom of movement had been restricted to the same degree as if she had been formally arrested. The court noted that on the morning of the murder, defendant was not in fact free to leave the police barracks, and nothing that occurred that day would have led her to believe that she was free to go. The court explained that defendant was essentially under armed guard during her time at the police barracks, and her encounter with police was clearly neither of "short duration" nor "limited and routine."

¶ 17. The court rejected the State's argument that, because the officers had informed defendant that they considered her a witness, she was not "in custody." The court found that the custodial circumstances in this case were "so overwhelming and palpable" that no amount of verbal explanation to the contrary could turn what had occurred into a voluntary, noncustodial encounter. Thus, the court concluded, the totality of the circumstances indicated that a reasonable person in defendant's position would not have believed that she was free to go, and would have believed that she was actually in custody and "at the mercy of the police."

¶ 18. The court next considered whether defendant had been "interrogated" within the meaning of *Miranda*. The court rejected the State's argument that defendant had not been "interrogated" because the officers did not consider her a suspect. The court explained that what had occurred was "express questioning" by law enforcement officers "in every sense that matters."

¶ 19. The court also found that, to the same extent that defendant was entitled to pre-interrogation warnings of her rights to counsel and to remain silent, she was also entitled, as a juvenile, to the presence and assistance of an independent, interested, and informed adult. Thus, for this reason as well, the court concluded that defendant's statements should be suppressed. The State requested and received permission to take an interlocutory appeal from the court's order.

¶ 20. While the State's appeal was pending, the trial court issued an order denying defendant's motion to dismiss. The court rejected defendant's assertion that her speedy trial and due process rights had been violated by the delay between her "de facto arrest" in February 2000 and her indictment. As the court explained, speedy trial rights are triggered by either a formal indictment or information or by the actual restraints imposed by arrest and holding to answer a criminal charge. The court stated that, if pressed, it would likely find that defendant's illegal de facto arrest was an "arrest" for purposes of triggering a Sixth Amendment speedy trial claim; however, the court explained, defendant was not formally "held to answer" to any homicide charge at that time, and thus, the speedy trial clause did not apply. The court found that the "substantial restrictions" on defendant's liberty were simply not "for purposes of answering a criminal charge," but were the result of other independent legal mechanisms that the State had every right to pursue, and which were reviewed and approved by other courts at appropriate junctures. Even assuming arguendo that defendant's speedy trial rights were triggered, the court found that defendant had not demonstrated that she suffered any prejudice from the delay between the homicide and the formal charge.

¶ 21. As to defendant's due process claim, the court found that defendant had failed to show that the precharge delay had caused any actual, substantial prejudice to her ability to mount a defense and receive a fair trial, or that the delay was the result of some intentional conduct by the prosecution to obtain an unfair tactical or strategic advantage in the case against her. The court explained that the only potential prejudice identified by defendant was her assertion that her expert psychological witness had been unable to conduct a full-scale evaluation until almost two years after the offense. The court found that the State was not responsible for this delay, nor had the State somehow prevented defendant and her advisors from arranging for the evaluation. The court noted that defendant knew at the outset that her mental, emotional, and physical status would likely be an issue that required full-scale evaluation. Moreover, the court explained, it was unpersuaded that defendant had in fact suffered any substantial prejudice in this regard, as the expert's analysis and opinion testimony was thorough and extensive.

¶ 22. The court also rejected defendant's argument that the State's delay in charging her was an "intentional device" to gain an unfair "tactical advantage" for purposes of prosecuting the case. The court found that defendant had failed to establish that the state's attorney

intentionally delayed the commencement of official prosecution against her, and in doing so, consciously acted in some disreputable fashion to obtain unfair advantage. The court therefore found no violation of defendant's right to due process of law in connection with the delay in formally charging her with first degree murder. Defendant requested permission to take an interlocutory appeal from the court's order, and her request was granted. By entry order dated November 21, 2003, defendant's appeal was consolidated with the State's appeal.

¶ 23. We first address the State's challenge to the motion to suppress. According to the State, the motion should have been denied because defendant was not subjected to a "de facto arrest" on the morning of the murder, nor was she subjected to "custodial interrogation." As to its latter argument, the State maintains that, based on the totality of the circumstances, a reasonable person in defendant's position would have believed that she was a witness, not a murder suspect. Additionally, the State argues, because the interviewing officers believed that defendant was a witness, their questions were not designed to elicit incriminating responses, and thus they did not "interrogate" defendant within the meaning of Miranda.

¶ 24. When considering a motion to suppress, we review the trial court's factual findings for clear error; we review its legal conclusion de novo. See State v. Lawrence, 2003 VT 68, ¶ 9, 175 Vt. 600, 834 A.2d 10 (mem.). As discussed below, we conclude that the trial court properly granted defendant's motion to suppress. The court's findings support its conclusion that defendant was subjected to "custodial interrogation" without being advised of her rights, and without the assistance of an independent interested adult. Based on our conclusion, we do not address the State's argument that the court erred in finding that defendant was subject to an illegal de facto arrest on the morning of the murder.

¶ 25. Before being subjected to "custodial interrogation," a criminal suspect is entitled to be advised of her right to remain silent and to have an attorney present during questioning. State v. Garbutt, 173 Vt. 277, 282, 790 A.2d 444, 448 (2001) (citing Miranda v. Arizona, 384 U.S. 436, 457-58 (1966)). "'Custodial interrogation'" is "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Id. (quoting Miranda, 384 U.S. at 444). In evaluating whether a suspect is in custody for purposes of Miranda, the trial

court must objectively examine "'the totality of the circumstances to determine if a reasonable person would believe he or she were free to leave or to refuse to answer police questioning.'" *Id.* (quoting *State v. Willis*, 145 Vt. 459, 475, 494 A.2d 108, 117 (1985)).

¶ 26. The trial court properly concluded that defendant was "in custody" as contemplated by *Miranda*. As the trial court found, defendant was forcibly removed from her vehicle at a police roadblock. She was handcuffed, and transported to the police barracks in a police cruiser. After arriving at the barracks, she was placed in a room with an armed guard outside. She was interviewed by two police officers in a small room for approximately one hour. At no time was defendant in fact free to leave the police barracks. The State does not challenge any of these findings as clearly erroneous, and these findings support the court's conclusion that a reasonable person in defendant's position would have believed that she was in custody.

¶ 27. The State's argument to the contrary is without merit. At most, the officers' subjective beliefs as to defendant's status are one factor to be considered in determining whether a reasonable person in defendant's position would believe that she was in custody. See *Stansbury v. California*, 511 U.S. 318, 325 (1994) (per curiam) (officer's views concerning nature of interrogation, or beliefs concerning individual's potential culpability, may be one among many factors in making custody determination, but only if officer's views were manifested to individual and would have affected how reasonable person would perceive his freedom to leave). The *Stansbury* Court recognized that the "weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case." *Id.* In this case, as the trial court found, no amount of verbal explanation could turn what occurred on the morning of the murder into a voluntary, noncustodial encounter.

¶ 28. The cases on which the State relies do not compel a contrary conclusion. See, e.g., *People v. Yukl*, 256 N.E.2d 172, 175 (N.Y. 1969) (holding that reasonable innocent man in defendant's position would not have considered himself "in custody" during interview at police station where he had called police, voluntarily accompanied officers to police station, and voluntarily answered questions); *People v. Maldonado*, 687 N.Y.S.2d 62, 63 (App. Div. 1999) (mem.) (holding that reasonable innocent person in defendant's position would not assume that his admission to helping slightly move murder victim's body rendered interview custodial, given noncoercive circumstances of interview, including fact that police continued to treat him as a witness

rather than a suspect after he made admission); *People v. Putland*, 482 N.Y.S.2d 882, 885-86, 888 (App. Div. 1984) (per curiam) (holding that juvenile was not "in custody" where he and his father voluntarily accompanied police to the police barracks, he was initially interviewed with his father present, and he was repeatedly informed that he was free to leave the interview room and go home at any point). As discussed above, in this case, the trial court's factual findings, unchallenged by the State, support the legal conclusion that a reasonable person in defendant's position would have believed that she was in custody.

¶ 29. The State also challenges the trial court's conclusion that defendant was "interrogated" by police. Relying on *Rhode Island v. Innis*, 446 U.S. 291 (1980), and *United States v. Morales*, 834 F.2d 35 (2d Cir. 1987), the State maintains that the officers did not "interrogate" defendant because they did not believe that she was a suspect; thus, their questions were not designed to elicit potentially incriminatory answers.

¶ 30. We reject this argument, and we decline to adopt the two-part test enunciated in *Morales* to evaluate whether defendant was "interrogated" within the meaning of *Miranda*. See *Morales*, 834 F.2d at 38 (holding that "custodial interrogation" occurs when questioning is (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine individual's will to resist and compel him to speak, and (2) when inquiry is conducted by officers who are aware of potentially incriminatory nature of disclosures sought.). The United States Supreme Court has made clear that "interrogation" occurs "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Innis*, 446 U.S. at 300-01. See *id.* at 301 ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."). While not all statements obtained by police after a person has been taken into custody should be considered the product of interrogation, in this case, defendant was expressly questioned about her role in the slaying of her stepmother. The officers asked defendant about her fingerprints on the murder weapon, and they questioned her about wanting to kill her stepmother. Thus, defendant was subjected to "interrogation" within the meaning of

*Miranda.* See *Innis*, 446 U.S. at 300; see also *United States v. Montgomery*, 714 F.2d 201, 202 (1st Cir. 1983) (where questioning was "express," court need not address whether suspect was subjected to "functional equivalent" of express questioning, i.e., whether there were words or actions on the part of the police that police should have known were reasonably likely to elicit incriminating response from suspect).

▪ ¶ 31. We therefore conclude that, because defendant was subjected to "custodial interrogation" without being advised of her *Miranda* rights, the trial court properly granted her motion to suppress. We note that this conclusion would also be compelled by the fact that defendant, a juvenile, was not provided with the assistance of an independent, interested adult prior to being subjected to custodial interrogation. See *In re E.T.C.*, 141 Vt. 375, 379, 449 A.2d 937, 940 (1982) (to voluntarily and intelligently waive right against self-incrimination and right to counsel, juvenile must have opportunity to consult with adult who is genuinely interested in her welfare and completely independent from the prosecution, and adult must be informed and aware of rights guaranteed to juvenile).

¶ 32. We turn next to the trial court's denial of defendant's motion to dismiss. Defendant argues that her motion should have been granted because the twenty-six month delay between her "de facto arrest" and her indictment violated her speedy trial rights. She maintains that her speedy trial rights were triggered in February 2000 when she was "arrested and held to answer" to a future first degree murder charge. According to defendant, her detention as a CHINS and as a material witness were "holding actions" by the prosecutor, and, in either status, she was treated as a precharge, pretrial, or preplea detainee, with the single exception that she had not been formally charged with any crime. Assuming that her speedy trial rights were triggered in February 2000, defendant argues that the delay in indicting her warrants dismissal of the charge against her.

¶ 33. We review the trial court's denial of defendant's motion to dismiss for abuse of discretion. *State v. Keith*, 160 Vt. 257, 266, 628 A.2d 1247, 1253 (1993). As discussed below, we conclude that defendant's speedy trial rights did not attach until she was indicted in April 2002 because she was not "arrested and held to answer" to a first degree murder charge until that date. Based on our conclusion, we do not address defendant's assertion that the factors that make up the speedy trial analysis weigh in her favor.

¶ 34. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." The speedy trial protections are triggered by "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge." *United States v. Marion*, 404 U.S. 307, 320 (1971). "Although delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment, or to a claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending." *United States v. MacDonald*, 456 U.S. 1, 7 (1982) (internal citation omitted); see also *State v. Ellis*, 149 Vt. 264, 267, 542 A.2d 279, 281 (1988) ("An accused's right to a prompt inquiry into criminal charges is fundamental, and the charging authority has a duty under the Sixth Amendment to provide a prompt trial.").

¶ 35. This triggering requirement serves the purposes underlying the Speedy Trial Clause. As the *MacDonald* Court explained:

> The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

456 U.S. at 8; see also *United States v. Loud Hawk*, 474 U.S. 302, 312 (1986) ("[T]he Speedy Trial Clause's core concern is impairment of liberty; it does not shield a suspect or a defendant from every expense or inconvenience associated with criminal defense."). When there are no charges outstanding, "personal liberty is certainly not impaired to the same degree as it is after arrest while charges are pending." *MacDonald*, 456 U.S. at 9.

¶ 36. In this case, defendant did not suffer the "actual restraints imposed by arrest and holding to answer to a criminal charge" until April 2002. Even assuming arguendo that defendant was "arrested" for purposes of the speedy trial clause in February 2000, she was not "held to answer" to a criminal charge until her indictment for first degree murder. Defendant's arguments to the contrary are unavailing. As the trial court found, defendant was detained pursuant to independent legal mechanisms that the State had every right to

pursue. Her status as a CHINS, and her placement at Woodside and The Pines, were reviewed by the family court at appropriate junctures. Defendant did not appeal from any of the family court's decisions. Indeed, defendant stipulated that she was a CHINS, and she recognized that she would likely be placed at Woodside. She agreed to her placement at The Pines. The transfer of legal guardianship and custody over defendant to SRS was not an "actual restraint[] imposed by arrest and holding to answer a criminal charge." *Marion*, 404 U.S. at 320.

¶ 37. Similarly, defendant's detention as a material witness was not for the purpose of answering a criminal charge, and it did not trigger defendant's speedy trial rights. The State was legally entitled to invoke the material witness procedure, and indeed, defendant stipulated to the provisions in the material witness order. She did not challenge this order until August 2001. In October 2001, the order was vacated, and after a hearing in the family court, defendant was placed at The Pines, where she remained until her indictment. Whatever the State's motivation in availing itself of these mechanisms, they were legally available to it, and they operated independently of any criminal charge against defendant. Defendant's speedy trial rights did not attach until her indictment, and therefore, the trial court properly rejected her speedy trial claim.

¶ 38. Finally, defendant argues that her state and federal due process rights were violated by the delay between the murder and her indictment. Defendant asserts that the delay was a "substantial factor" in the trial court's decision to deny her motion to transfer her case to the family court, and the trial court erred in finding that this alleged prejudice did not affect her fair trial rights. Additionally, defendant argues that the passage of time resulted in faded memories, loss of demeanor evidence, and the inability of her expert psychological witness to conduct a timely evaluation. Defendant also maintains that "there can be no question" that the delay was intentional and that the prosecutor gained an important tactical advantage by not charging her.

¶ 39. The Due Process Clause of the Fifth Amendment of the United States Constitution may require the dismissal of an indictment if it is shown that a pre-indictment delay caused substantial prejudice to defendant's rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. *Marion*, 404 U.S. at 324; *Ellis*, 149 Vt. at 268, 542 A.2d at 282 (citing *Marion*,

404 U.S. at 324). Proof of actual prejudice is generally "a necessary but not sufficient element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *United States v. Lovasco*, 431 U.S. 783, 790 (1977). In determining whether there has been a due process violation, it is not the court's role to second-guess the prosecutor's judgment as to when to seek an indictment. Instead, the court must determine whether compelling defendant to stand trial in light of the delay "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency." *Id.* (internal quotation marks and citations omitted).

¶ 40. In this case, defendant has not demonstrated that the preindictment delay violated her due process rights. First, defendant fails to identify any actual substantial prejudice that she suffered from the delay. While she asserts that the trial court might have granted her motion to transfer had she been indicted earlier, she concedes that there is no way of knowing how the court would have ruled. This claim is purely speculative, and it does not establish that defendant suffered substantial actual prejudice to her ability to defend herself.

¶ 41. Defendant's remaining claims of prejudice are equally unavailing. As previously noted, the trial court rejected defendant's assertion that the delay prejudiced her ability to obtain an expert evaluation of her mental state at the time of the murder. As the court explained, defendant knew that her mental state would be at issue, and the State did not prevent her from securing an expert evaluation. Moreover, as the court found, the expert's testimony was thorough and extensive. Thus, this claim of prejudice is unwarranted. Similarly, defendant's general assertions that "memories have faded," and that she is now two years older, do not suffice to show that she suffered actual substantial prejudice to her ability to defend herself at trial. Defendant does not specifically identify any lost evidence, nor does she show how her age will substantially prejudice her ability to conduct her defense. We therefore conclude that defendant has not met the first requirement necessary to show that her due process rights were violated.

¶ 42. Defendant's arguments also fail to satisfy the second requirement. Defendant asserts that the prosecutor intentionally exploited inadmissible evidence to secure and maintain her incarceration until he was ready to proceed against her in criminal court. According to defendant, the prosecutor's inability to charge her earlier was not the

result of neutral factors, but instead resulted from the State's own procedural missteps. In this way, defendant argues, the prosecutor intentionally delayed charging her to gain an unfair advantage over her at trial. The trial court found otherwise. It credited the State's argument that it would have been an abuse of prosecutorial authority to formally charge defendant without first obtaining admissible corroborating evidence to support and ultimately prove the charge. Moreover, the court explained, although defendant's detention gave the State some additional leverage during plea negotiations, the intervention as a matter of law of other entities, such as SRS, the family court, and the district court (with respect to the material witness order), undermined any argument that defendant's detention was an integral part of the prosecution's "intentional device" to gain an unfair strategic advantage over defendant at trial.

¶ 43. The trial court did not err in reaching this conclusion. As the trial court recognized, the state's attorney was not obligated to file charges before he had probable cause to believe that defendant was guilty, nor was he obligated to file charges as soon as probable cause existed but before he was satisfied that he would be able to establish defendant's guilt beyond a reasonable doubt. See *Lovasco*, 431 U.S. at 790-91. Moreover, as the trial court found, defendant's detention as a CHINS and as a material witness were not within the exclusive control of the state's attorney; they were reviewed and approved by both the family court and the district court. That the State availed itself of these legal mechanisms does not establish that the State intentionally delayed charging defendant to gain an unfair advantage over her at trial. Defendant has not established that her due process rights were violated by the pre-indictment delay, and the trial court properly denied her motion to dismiss.

*Affirmed.*