2005 VT 20

# State of Vermont v. Shawn Pontbriand

[878 A.2d 227]

No. 03-537

Present: Amestoy, C.J.,[1] Dooley, Johnson, Skoglund and Reiber, JJ., and Allen, C.J. (Ret.),[2] Specially Assigned

Opinion Filed February 18, 2005
Motion for Reargument Denied March 29, 2005

---

[1] Chief Justice Amestoy sat for oral argument but did not participate in this decision.

[2] Retired Chief Justice Allen reviewed the tape of oral argument and the briefing, and participates in this decision.

*Robert Simpson*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellant.

*Matthew F. Valerio*, Defender General, and *Henry Hinton*, Appellate Attorney, Montpelier, for Defendant-Appellee.

¶ 1. **Skoglund, J.** The State appeals a trial court order suppressing statements defendant Shawn Pontbriand made to law enforcement officers before his arrest. The trial court found that Pontbriand was in police custody at the time the statements were made, and that the officers improperly reinitiated questioning after Pontbriand invoked his right to counsel. We reverse.

¶ 2. In early May 2002, the Chittenden Unit for Special Investigations began investigating Pontbriand's relationship with the minor daughters of his girlfriend, T.N. During this investigation, T.N. contacted the police after Pontbriand sent her an e-mail in which he admitted to having an inappropriate sexual relationship with one of the girls. The following day, Pontbriand collapsed and was transported to Fletcher Allen Hospital, where he was diagnosed initially with dehydration and later with cancer.

¶ 3. State Police Corporal James Claremont and Detective Sergeant Jennifer Morrison of the Burlington Police Department came to Fletcher Allen to interview Pontbriand the morning he was hospitalized. When they arrived, he was in bed and a medical technician was performing diagnostic tests on him. After the technician left the room, they introduced themselves as detectives who investigate sexual offenses. They brought a printed copy of the incriminating e-mail Pontbriand had sent to his girlfriend and held the copy so that Pontbriand could see it. Corporal Claremont told Pontbriand they were sure he knew why they had come. At that point, Pontbriand indicated that he wanted to talk to a lawyer.

¶ 4. Detective Sergeant Morrison testified that she immediately replied by saying that they would respect that, but explained to Pontbriand that this was his opportunity to tell his side of the story and that they were not going to come back again.

¶ 5. At the suppression hearing, the State submitted a compact disc recording of the hospital conversation, on which Pontbriand is heard to say he wanted to take care of the problem, and that he wanted to solve it. Corporal Claremont repeated that he was not under arrest, and that he did not have to talk to them. After more conversation in which Pontbriand stated that he did not want to run from the problem, Detective Sergeant Morrison again told him that his cooperation had to be voluntary if they were going to continue talking, and that they would not force him to talk. Both officers made clear that they could not promise not to arrest him.

¶ 6. The trial court found that Pontbriand informed the investigating officers "he wanted to talk to them and that he would do so without speaking to a lawyer."

¶ 7. Corporal Claremont then began to ask him questions about the alleged abuse, and Pontbriand made incriminating statements in response. At the close of the interview, the investigating officers informed him that he was under arrest. Based on his statements and

other evidence, Pontbriand was charged with aggravated sexual assault and lewd and lascivious conduct with a child.

¶ 8. Pontbriand moved to suppress the statements he made to police, alleging (1) that he was in police custody at the time of questioning and that the investigating officers were therefore barred from reinitiating interrogation after he requested a lawyer, and (2) that his statements were coerced and therefore inadmissible. The trial court granted his motion to suppress, concluding that Pontbriand was in custody for purposes of *Miranda*, that the police failed to give the warnings required by *Miranda*, and, therefore, that any statements Pontbriand made could not be used as evidence against him at trial. The State then filed this interlocutory appeal.

¶ 9. On appeal, the State contends that the trial court erred when it found that Pontbriand was in police custody at the time of questioning, rendering his statements inadmissible under *Miranda v. Arizona*, 384 U.S. 436 (1966). We agree.

¶ 10. Under *Miranda*, as currently applied, the police must stop questioning a suspect who is in custody after he or she requests an attorney. *State v. Trombley*, 147 Vt. 371, 374, 518 A.2d 20, 23 (1986) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). No such requirement exists, however, for suspects who are not in custody. See *McNeil v. Wisconsin*, 501 U.S. 171, 181-82 (1991) (suspect cannot preemptively invoke *Miranda* rights by requesting counsel before custody is established); *State v. Garbutt*, 173 Vt. 277, 282, 790 A.2d 444, 448 (2001) (noting that *Miranda* warnings are not required for suspects not in custody). A defendant seeking to suppress statements under this rule has the burden of proving that he or she was in police custody when the incriminating statements were made. *State v. LeClaire*, 2003 VT 4, ¶ 15, 175 Vt. 52, 819 A.2d 719.

¶ 11. The essential question in determining whether a defendant was in custody for *Miranda* purposes "is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* ¶ 16 (internal quotations omitted). The U.S. Supreme Court has made clear that under this standard

a noncustodial situation is not converted to one in which *Miranda* applies simply because . . . in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police

officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to [suspects who are not in custody].

*Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). To determine whether a suspect is in custody, courts should look for "situations approximating 'incommunicado interrogation of individuals in a police-dominated atmosphere,'" *State v. Willis*, 145 Vt. 459, 475, 494 A.2d 108, 117 (1985) (quoting *Miranda*, 384 U.S. at 445), and must consider "the totality of the circumstances to determine if a *reasonable person* would believe he or she were free to leave or to refuse to answer police questioning," *id.* (emphasis added). The suspect's subjective belief as to his or her custody status is irrelevant in this determination. *Garbutt*, 173 Vt. at 282, 790 A.2d at 448. The beliefs or intentions of the investigating officers conducting the interview are relevant only if communicated to the suspect, and only to the extent they might cause a reasonable person to believe he or she is in custody. *Id.*

¶ 12. On appeal of a motion to suppress, we accept the trial court's underlying factual findings so long as they are not clearly erroneous, but review conclusions of law de novo. *State v. Lawrence*, 2003 VT 68, ¶¶ 8-9, 175 Vt. 600, 834 A.2d 10 (mem.). Therefore, the trial court's findings of fact regarding the course of the interview receive deference, but its ultimate legal determination that the totality of the circumstances would have led a reasonable person to believe that he or she was in custody is reviewed de novo. The U.S. Supreme Court has explained that in determining whether a person was in custody for *Miranda* purposes, "[t]wo discrete inquiries are essential ... first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnotes omitted) (examining suppression of testimony on *Miranda* grounds in the context of a federal habeas corpus claim). The Court identified the second inquiry as a "'mixed question of law and fact' qualifying for independent review." *Id.* at 113. We recently employed this standard of review in the *Miranda* context in *State v. Beer*, 2004 VT 99, ¶¶ 24-27, 177 Vt. 245, 864 A.2d 643.

¶ 13. In concluding that Pontbriand was in custody, the trial court relied on the following findings: Pontbriand was hospitalized; Pontbriand could see the incriminating e-mail he sent to T.N.; the investi-

gating officers told Pontbriand that they were aware of the situation; and the investigating officers' physical positions during the interview. As explained below, the totality of the circumstances surrounding Pontbriand's questioning does not support a finding that he was in police custody at any point before he was arrested at the close of the interview.

■ ¶ 14. As a preliminary matter, we note that despite the trial court's apparent reliance on the fact that Pontbriand was "sick in a hospital bed" during the interview, any difficulty he might have had leaving his hospital room as a result of his illness is not determinative of the custody inquiry. Custodial interrogation is the questioning of a suspect where the suspect "is taken into custody or otherwise deprived of his freedom *by the authorities* in any significant way." *Miranda*, 384 U.S. at 478 (emphasis added). Federal appellate courts and a substantial majority of state courts have found that custody is not established merely because a suspect is unable to leave the hospital due to his or her medical condition. See, e.g., *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir. 1994) (hospitalized suspect not in custody where officers did not restrict his freedom of movement through physical restraint or display of authority); *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (hospitalized suspect not in custody where police were not responsible for hospitalization and did not unnecessarily extend it); *State v. Tucker*, 557 A.2d 270, 272 (N.H. 1989) (following the majority of state and federal authority in finding that "the restraint contemplated by *Miranda* is that interference with the defendant's freedom which is *imposed by the police*" (emphasis added)); *Commonwealth v. Ellis*, 549 A.2d 1323, 1333 (Pa. Super. Ct. 1988) (holding that appellant was not in custody for *Miranda* purposes where police officer questioned him while he awaited treatment in hospital emergency room). We follow the majority approach and hold that the restraint on freedom of movement incumbent in hospitalization does not, on its own, constitute custody for *Miranda* purposes. Thus, we may consider Pontbriand's illness and medical confinement only to the extent that, as part of the totality of the circumstances surrounding the interview, they would impact a reasonable person's belief that he or she was actually in police custody, unable to leave or refuse to answer police questioning.

¶ 15. In holding that Pontbriand was in custody when the questioning occurred, the trial court determined that he was interrogated in a "police-dominated atmosphere." In the four cases consolidated in *Miranda*, police placed suspects under arrest, transported them to

police stations, and questioned them in isolation for hours or, in some cases, days without informing them of their constitutional rights to remain silent and to be represented by counsel. See 384 U.S. at 491, 493-94, 497. The *Miranda* Court was deeply troubled by this apparently common practice of conducting "incommunicado interrogation ... in a police-dominated atmosphere," where the "interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner." *Id.* at 445, 457. The Court held that, although statements made under these conditions might not qualify as involuntary in traditional terms, the "Fifth Amendment privilege ... serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Id.* at 467.

¶ 16. Thus, for purposes of determining whether a suspect was in custody, a "police-dominated atmosphere" results when law enforcement officers take action to fetter the suspect's freedom of movement during the interrogation. Courts have found that a suspect was in custody where objective evidence showed that the police questioned the suspect in an enclosed space and isolated the suspect from others for an extended time. See, e.g., *State v. Bridges*, 2003 ME 103, ¶¶ 27, 33-36, 829 A.2d 247 (holding that suspect was in custody where police officers isolated her for hours in a small fire-station bedroom with closed doors and drawn shades, hidden from public view). Here, however, although the investigating officers appear to have been alone with Pontbriand for some time, there is no indication that they shut the door or otherwise barred entry to the hospital room during questioning. In fact, medical technicians were present in the room when the investigating officers arrived, and at least once again during the interview, suggesting that the officers took no affirmative steps to isolate Pontbriand. Thus, the presence of medical personnel during the interview and the absence of any evidence that the investigating officers attempted to prevent others from entering the hospital room undermine the trial court's conclusion that the officers created a "police-dominated atmosphere."

¶ 17. The trial court also found that Corporal Claremont and Detective Sergeant Morrison stood over Pontbriand and questioned him while he lay in bed, and held that this contributed to creating a police-dominated atmosphere. The position of the questioner(s) relative to the suspect is often important in a *Miranda* custody determination because it might substantially alter a suspect's perception of his or her freedom to leave. See, e.g., *People v. Minjarez*, 81 P.3d 348, 356 (Colo.

2003) (factoring suspect's isolation in small room with two police officers blocking access to the door into custody determination). Here, however, the record contains nothing to support the court's finding that the investigating officers stood over Pontbriand while they talked with him. The only evidence in the record regarding their positions in the room came from the investigating officers themselves, with Detective Sergeant Morrison testifying that she and Corporal Claremont were seated during the interview, and that Pontbriand's path to the door was clear at all times. The court's finding was clearly erroneous. Therefore, we do not credit the trial court's reliance on it in concluding that the positioning of the investigating officers within the room would have created an atmosphere so police-dominated that a reasonable person would believe he or she was not free to leave.

¶ 18. In addition, in finding that Pontbriand was in custody, the trial court found that Pontbriand could not have believed he was still free to leave after he saw that the police had a print-out of the e-mail he sent to T.N., and they told him they already knew everything about the situation. The investigating officers undoubtedly made it clear to Pontbriand that they thought he had committed a crime, but this is not enough to establish custody for *Miranda* purposes. See *Stansbury v. California*, 511 U.S. 318, 325 (1994) (per curiam) ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."). In *Mathiason*, police told a suspect under interrogation that they thought he was involved in a burglary, and falsely informed him that they had recovered his fingerprints at the crime scene. *Mathiason*, 429 U.S. at 493. Despite this display of highly incriminating and completely fabricated evidence, the U.S. Supreme Court held that custody had not been established. *Id.* at 495. The print-out of Pontbriand's e-mail to T.N. and the investigating officers' statements that they knew what had happened and could not promise not to arrest him put Pontbriand on notice that the police thought he was guilty and he might face arrest at some point in the future. These actions did not, however, constitute evidence so overwhelming that a reasonable person in Pontbriand's position would believe that he or she was no longer free to end the conversation.

¶ 19. In the first few minutes of the interview, the investigating officers told Pontbriand multiple times that he was not under arrest, he was not required to talk to them, and he had to participate

willingly for the conversation to go forward. The trial court found that the investigating officers intended to arrest Pontbriand, that they lied to him when they told him otherwise, and that "[i]t does not matter that the police told him that he was not under arrest." We disagree. Although these types of statements are not dispositive on their own, see *State v. Brunell*, 150 Vt. 388, 392, 554 A.2d 242, 244 (1988) (concluding that repeated assertions by police that suspect was not under arrest did not outweigh host of other factors, including fact that police told suspect's mother, within earshot of suspect, that suspect "had" to go to police station), courts making *Miranda* custody determinations routinely take them into consideration when deciding if an atmosphere is police-dominated. See, e.g., *Mathiason*, 429 U.S. at 495 (observing that suspect was "immediately informed that he was not under arrest"); *Bridges*, 2003 ME 103, ¶ 28 (noting that statement that one is free to leave is important but not dispositive). Although Pontbriand testified that he thought the officers were lying when they told him he was not under arrest, his subjective belief as to the investigating officers' intent is irrelevant. *Garbutt*, 173 Vt. at 282, 790 A.2d at 448. The manner in which the officers communicated their intentions to Pontbriand — telling him that he was not under arrest, he had to participate willingly, and they could not promise not to arrest him — cuts against the conclusion that a reasonable person in Pontbriand's position would not believe "he or she were free to leave or to refuse to answer police questioning." *Willis*, 145 Vt. at 475, 494 A.2d at 117.

¶ 20. Pontbriand was interviewed by two nonuniformed law enforcement officers who do not appear to have taken any affirmative steps to isolate him from others. Although it is suggested that Pontbriand could see that the officers had incriminating evidence, and they told him that they knew everything about what he had done, they also informed him multiple times that he was not under arrest and that he did not have to talk to them. The officers may well have had enough evidence to arrest Pontbriand before they interviewed him, and may even have gone to the hospital with the intention of arresting him. For the purposes of this inquiry, however, their unarticulated intentions are irrelevant. Looking at the totality of the circumstances, the facts found by the trial court illustrate that Pontbriand was not in police custody during the interview, and we so hold. Accordingly, *Miranda* is inapplicable here, and the police were not obliged to stop questioning Pontbriand when he indicated he wished to speak with a lawyer.

¶ 21. Though not addressed by the trial court, Pontbriand's motion to suppress also contended that even if the investigating officers did

not violate his rights under *Miranda,* his statements were given involuntarily and are therefore inadmissible. A confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement. On the record developed by the trial court, however, it is evident that Pontbriand's statements were voluntary.

¶ 22. In addition to the Fifth Amendment's prohibition against self-incrimination, the Due Process Clause of the Fourteenth Amendment prevents admission of involuntary statements into evidence, regardless of the defendant's custodial situation. *Dickerson v. United States,* 530 U.S. 428, 433 (2000). Thus, a court may not admit statements that were given involuntarily, regardless of whether *Miranda* warnings were administered or even necessary. See *id.* at 444 (requiring voluntariness inquiry even after *Miranda* warnings administered); *State v. Badger,* 141 Vt. 430, 449-50, 450 A.2d 336, 347-48 (1982) (observing that in addition to any federal protections, involuntary statements are inadmissible under Vt. Const. ch. I, art. 10). When a defendant challenges a confession or inculpatory statement, the prosecution must establish by a preponderance of the evidence that the confession or statement was made voluntarily, *Lego v. Twomey,* 404 U.S. 477, 489 (1972); *People v. Gennings,* 808 P.2d 839, 843 (Colo. 1991), and that defendant knowingly waived the Fifth Amendment privilege, *Brunell,* 150 Vt. at 390, 554 A.2d at 243. It is, however, "generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect." *State v. Bacon,* 163 Vt. 279, 293, 658 A.2d 54, 64 (1995) (internal quotation omitted). Even where such tactics have an impact on a suspect's decision to talk to the police, the resulting statements are voluntary so long as they reflect "a product of the suspect's own balancing of competing considerations." *Id.* at 294, 658 A.2d at 64 (internal quotations omitted). Thus, the ultimate inquiry is whether, under the totality of the circumstances surrounding a confession, the suspect's will was overborne by the police. *Dickerson,* 530 U.S. at 434.

¶ 23. Pontbriand claims that the police subjected him to psychological coercion when they indicated they knew about his suspected crime, suggested it would be better for everyone involved if he "got everything out in the open," and encouraged him to put his fears aside and think about the other people involved. The State emphasizes that these comments came after the officers told Pontbriand that they worked for a special unit that investigated sexual offenses; that he was not under arrest; that he was not required to talk to them; and that "[w]e are

cops . . . and sometimes people go to jail, so we want to make sure that you want to talk to us."

¶ 24. "[C]oercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). If the will of the suspect is overborne and his capacity for self-determination critically impaired, his confession cannot be used against him. In *Arizona v. Fulminante*, 499 U.S. 279 (1991), a leading case on assessing the voluntariness of incriminating statements, the defendant was a suspect in the killing of his stepdaughter. While serving an unrelated sentence for possession of a firearm by a felon, Fulminante was befriended by a paid F.B.I. informant who had been instructed to get information from Fulminante about the killing. Apparently Fulminante was receiving "tough treatment" from other inmates as an alleged child murderer and the informant offered to protect Fulminante from physical recriminations in prison, but only if Fulminante told him what happened. He did. The U.S. Supreme Court found the question of whether Fulminante's confession was coerced "a close one," but held "[i]t was fear of physical violence, absent protection from his friend (and Government agent) Sarivola, which motivated Fulminante to confess," so that his "will was overborne in such a way as to render his confession the product of coercion." 499 U.S. at 287-88.

¶ 25. In *Gennings*, the trial court suppressed statements of Gennings, who was charged with aggravated incest, finding that the polygraph examiner conducted the post-examination interview in a psychologically coercive manner. 808 P.2d at 846. The polygraph examiner admitted that she informed the defendant that he had been deceptive on the examination and then used a "soft technique" by conveying a supportive attitude toward his predicament and telling him that he would feel better if he talked to her about the problem. *Id.* The so-called "soft technique," the examiner acknowledged, was utilized in order to obtain a truthful admission from the defendant. On appeal, the Supreme Court of Colorado reversed, finding that it could not, with any assurance, find that the polygraph examiner's conduct played so significant a role in overbearing the defendant's will as to have caused the defendant's statement to be constitutionally involuntary. *Id.* at 846-47.

¶ 26. The Supreme Court of Colorado applied the factors developed in *Gennings* in *People v. Medina*, 25 P.3d 1216 (Colo. 2001), where the trial court suppressed statements made by a defendant charged with child abuse resulting in serious bodily injury. The supreme court

affirmed, holding that the interrogating detective's repeated threats to have the child taken from both parents, unless the defendant confessed to shaking the child, had a significant role in inducing his confession, especially because the defendant was ill and suicidal when he made his statements. *Id.* at 1220-21, 1226.

¶ 27. Pontbriand's situation differs from those confronting Medina and Fulminante in that Pontbriand's inquisitors used significantly different techniques. Neither the conduct of the investigating officers nor the circumstances under which the interview took place subjected Pontbriand to the sort of psychological pressure that courts view as impermissibly coercive. In the absence of a threatened adverse consequence — like the threat of physical harm or repercussions against family members — for refusing to answer questions, Pontbriand's decision to continue the interview was a "product of [his] own balancing of competing considerations." *Bacon,* 163 Vt. at 294, 658 A.2d at 64 (quotations omitted).

¶ 28. We are not the first court to consider the type of interrogation practices challenged here. In several cases, courts have determined that police statements to a suspect suggesting he or she has one last chance to talk are not conclusive evidence of coercive questioning. See *United States v. Gamez,* 301 F.3d 1138, 1144 (9th Cir. 2002) (concluding that police statements that "it would 'behoove'" suspect to tell what he knew and that "this was his 'last chance' to come forward" did not amount to coercion); *People v. Wickham,* 53 P.3d 691, 696 (Colo. Ct. App. 2002) (holding that police statement that "defendant had one last chance to respond to the questions" was not coercive); *State v. Chung,* 519 A.2d 1175, 1183-84 (Conn. 1987) (characterizing police statements that "it may be your first chance and your last chance to straighten it out" and "I don't know that you'll have the opportunity to do it again" as not coercive where no promises or threats were made); *State v. Hough,* 571 N.W.2d 578, 581 (Minn. Ct. App. 1997) (determining that police statements that it was in suspect's "best interest" to talk and that "interview would be his only chance to tell his side of the story" were not promises or misrepresentations and were not coercion), *rev'd on other grounds,* 585 N.W.2d 393 (Minn. 1998). In a few cases, courts have found such statements to be a factor in establishing a coercive atmosphere, but in each case the surrounding circumstances have been more extreme than presented here. See, e.g., *Collazo v. Estelle,* 940 F.2d 411, 414, 416 (9th Cir. 1991) (finding coercion where police stated "[t]his is your last chance to talk to us," and implied that talking to a lawyer would make things worse for defendant and might lead to his

arrest for murder); *Medina*, 25 P.3d at 1225 (finding statement that suspect had one last chance to help himself was part of coercive environment where police also threatened state would take custody of his child if he was silent).

¶ 29. Pontbriand cites *State v. Cox*, 147 Vt. 421, 519 A.2d 1144 (1986), for the proposition that police officers exercise unlawful coercion when they tell a suspect that he or she will have only one opportunity to speak with them. In *Cox*, an inmate being interviewed as part of a presentence investigation asked to consult with counsel first, and was told that if he refused to proceed immediately, the interview would be terminated and the interviewer would not come back to talk to him again.[3] *Id.* at 422, 519 A.2d at 1145. The Court found that statements given in this context were involuntary because the "defendant was presented with two choices: (1) to await [arrival of counsel] and forfeit the interview, or (2) to proceed with the interview without additional advice." *Id.* at 425, 519 A.2d at 1147. Although superficially similar to the present case, *Cox* is readily distinguishable on two related grounds. First, the defendant in *Cox* was in prison awaiting sentencing when the interview was conducted, a factor courts weigh in evaluating the voluntariness of statements in presentence investigation reports. *Id.* Second, because it was a presentence investigation interview, the defendant in *Cox* could reasonably have feared that the judge would dispense with the interview altogether and proceed with sentencing without the benefit of his statement. See V.R.Cr.P. 32(c)(1)(C) (allowing judge to dispense with presentence investigation report where defendant refuses to participate in interview). Thus, Cox's failure to speak immediately could have adversely affected him at sentencing. Here, by comparison, Pontbriand had not yet been charged with a crime when he was interviewed. A person in his position could reasonably have anticipated that, even if the police declined to question him again, he would still have the opportunity to present his side of the story in court.

¶ 30. We conclude that Detective Sergeant Morrison's statement that this was Pontbriand's opportunity to talk to the police and

---

[3] In *Cox*, the defendant asked to speak not with his attorney, but with an investigator assigned to assist him by the public defender's office. The Court determined that in the context of a presentence investigation interview, the distinction was irrelevant for the purpose of Fifth Amendment analysis, and treated the defendant's request as a request for counsel. *Cox*, 147 Vt. at 424-25, 519 A.2d at 1146.

that they would not come back to talk again is not enough, absent any other evidence of coercive interrogation tactics, to make Pontbriand's further participation in the conversation involuntary.

¶ 31. Pontbriand's statements were obtained during brief, daytime questioning conducted by two law enforcement officers in a semi-public hospital room, unmarked by any of the traditional indicia of coercion. There was a legitimate purpose in their questioning, no perceptible unfairness, and little risk of injustice in the interrogation. Here, the totality of the circumstances surrounding the interview does not suggest an atmosphere so coercive as to overbear Pontbriand's free will. Corporal Claremont and Detective Sergeant Morrison plainly wanted a statement and worked to convince Pontbriand that confessing was the right thing to do, but in the context of police questioning "persuasion is not coercion," *People v. Matheny*, 46 P.3d 453, 467 (Colo. 2002), and Pontbriand's decision to talk was ultimately his own, perhaps the result of a commendable qualm of conscience. Accordingly, we find that his statements were voluntary and are therefore properly admissible at trial.

*Reversed.*

¶ 32. **Johnson, J.**, dissenting. Regardless of whether or not Pontbriand was in police custody, I cannot agree with the majority that he made his statements voluntarily, and I therefore respectfully dissent.

¶ 33. In a relatively recent decision upholding the constitutional basis of *Miranda*, the U.S. Supreme Court recounted a brief history of the law governing the admission of confessions. *Dickerson v. United States*, 530 U.S. 428, 432-34 (2000). There, the Court observed that the policy of excluding coerced confessions has venerable roots in the English common law, where courts recognized that "'a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape ... that no credit ought to be given to it; and therefore it is rejected[.]'" *Id.* at 433 (quoting *King v. Warickshall*, 168 Eng. Rep. 234, 235 (K.B. 1783)). In the United States, that policy has evolved into a doctrine — based in the Fifth and Fourteenth Amendments — that excludes involuntary statements made to police officers. *Id.* Until *Miranda*, the Court continued to base its decisions excluding coerced confessions primarily on notions of due process, and it has not abandoned the voluntariness doctrine as a distinct body of law even as its focus has shifted to questions of police custody during suspect interrogation. 530 U.S. at 434 (citing *Malloy v. Hogan*, 378 U.S. 1 (1964)).

¶ 34. In *Miranda,* the Court confronted the deeply troubling practice of "incommunicado interrogation of individuals in a police-dominated atmosphere," *Miranda v. Arizona,* 384 U.S. 436, 445 (1966), where officers created an interview environment designed "to subjugate the individual to the will of his examiner," *id.* at 457; accord *State v. Garbutt,* 173 Vt. 277, 282, 790 A.2d 444, 448 (2001). The Court went on to hold that police must advise suspects of their rights to silence and counsel before interrogating them in a custodial setting. *Miranda,* 384 U.S. at 479. The decision did not, however, eviscerate the older doctrine excluding involuntary statements made in noncustodial contexts, and concluded that the Fifth Amendment "serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Id.* at 467; accord *State v. Badger,* 141 Vt. 430, 449-50, 450 A.2d 336, 347-48 (1982). In subsequent years, the test of voluntariness has evolved into an inquiry that examines whether the totality of the circumstances surrounding a confession suggests that the police overbore the suspect's will. *Dickerson,* 530 U.S. at 434.

¶ 35. The totality of the circumstances approach recognizes the synergistic nature of coercive interrogations. The combination of many subtle police tactics often results in a coercive atmosphere that is obscured when the context is broken down to its constituent parts. For this reason, involuntary confession cases are highly fact-specific, and include situations, such as this one, where the police did not beat or physically harm the suspect, but instead subjected him to tactical psychological coercion. See *Arizona v. Fulminante,* 499 U.S. 279, 287-88 (1991) (explaining that coercive police conduct includes not only physical abuse or threats but also subtle forms of psychological coercion). In *Dickerson* the Court recognized that "custodial police interrogation, by its very nature, isolates and pressures the individual . . . [e]ven without employing brutality, the 'third degree' or [other] specific stratagems, . . . [it] exacts a heavy toll on individual liberty and trades on the weakness of individuals." 530 U.S. at 435 (internal quotations omitted). The same concerns arise in noncustodial interrogations where the totality of the circumstances indicate that police have created an atmosphere designed to exploit an individual's weaknesses. *People v. Gennings,* 808 P.2d 839, 844 (Colo. 1991).

¶ 36. As the phrase suggests, many factors can come together to create a totality of circumstances sufficient to overbear a suspect's will. In some cases, one particular circumstance may so offend our basic notion of a free and uncoerced confession that it alone renders a

suspect's statements involuntary. In other cases, no single factor is enough to overbear an individual's will, but the aggregate effect of many subtle, exploitative techniques is a coercive environment powerful enough to elicit an involuntary confession. To aid in evaluating the myriad considerations relevant to the totality of the circumstances inquiry, the Colorado Supreme Court has developed a list of factors, including:

> (1) whether the defendant was in custody; (2) whether the defendant was free to leave; (3) whether the defendant was aware of the situation; (4) whether the police read *Miranda* rights to the defendant; (5) whether the defendant understood and waived *Miranda* rights; (6) whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation; (7) whether the statement was made during the interrogation or volunteered later; (8) whether the police threatened defendant or promised anything directly or impliedly; (9) the method or style of the interrogation; (10) the defendant's mental and physical condition just prior to the interrogation; (11) the length of the interrogation; (12) the location of the interrogation; and (13) the physical conditions of the location where the interrogation occurred.

*People v. Medina*, 25 P.3d 1216, 1222-23 (Colo. 2001) (citing *Gennings*, 808 P.2d at 844). This list is not exclusive, nor is it weighted toward any particular factor, and a given case may not implicate all of the factors listed. *Gennings*, 808 P.2d at 844. It is, however, a useful rubric to guide our evaluation of the voluntariness of Pontbriand's statements in this case. In conducting this evaluation, it is critical to remember that the State ultimately bears the burden of proving, by a preponderance of the evidence, that Pontbriand's statements were not the product of undue coercion. *State v. Brunell*, 150 Vt. 388, 390, 554 A.2d 242, 243 (1988).

¶ 37. Looking to the factors identified in *Medina*, it is significant that the police chose to interview Pontbriand as he lay in a hospital emergency room bed receiving medical treatment. *Medina*, 25 P.3d at 1222-23. He had undergone a series of diagnostic tests just before the questioning began and was, in this sense, confined to the room with police officers, who made it clear that they knew he had committed a crime. While the majority focuses on the *physical* circumstances of the hospital setting — discussing the impact of the restraints on Pont-

briand's movement, describing the officers' relative location in the room, and characterizing their posture near the bed — the more salient concern here is Pontbriand's mental and emotional condition. He was sick and vulnerable, and in such a state he was particularly susceptible to manipulation and intimidation. Dizzy, suffering from dehydration, and later diagnosed with cancer, Pontbriand was in no position to make a major life decision. The officers gained a considerable psychological advantage under these circumstances, and, regardless of intent, their tactics plainly set the stage for a coercive interrogation. See *id.* (looking to the defendant's mental and physical condition, awareness of the situation, and the location, conditions, and tactics of interrogation).

¶ 38. Within this already coercive context, the officers visibly displayed a printed copy of the incriminating communication that Pontbriand had sent to his girlfriend, see *Gennings*, 808 P.2d at 843-44 ("Coercive police conduct includes not only physical abuse or threats ... but also subtle forms of psychological coercion."), and told him it would be better for everyone involved if he got everything out in the open. After Pontbriand said he was afraid to talk, Corporal Claremont told him to "[p]ut [his] fears aside for a minute and then think about the other people involved .... And really, the only way to help that situation ... is to be completely open about it." He went on to suggest that he and his partner were "the kinder, gentler police," and told Pontbriand that it was "much better that we talk to you than if you just marched into a police station with people who don't have special training of this type." See *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam) (excluding statements "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight" (internal quotations omitted)).

¶ 39. The officers made certain to inform Pontbriand that he was not under arrest, and therefore they felt free to avoid advising him of his *Miranda* rights. While such advice may not have been constitutionally mandated in this case, courts have treated the omission of these simple warnings as evidence of a coercive interrogation environment. See *Edwards v. State*, 973 P.2d 41, 49 (Wyo. 1999) (listing the absence of *Miranda* warnings among components of a coercive interrogation); accord *Medina*, 25 P.3d at 1222-23. Indeed the officers here not only chose to forego *Miranda*, but when Pontbriand asked to speak to a lawyer Officer Morrison responded by saying, "We'll respect that and I just want to let you know that this is your opportunity to give us your side of the story because we are not going to come back again." Faced

with the possibility of losing the chance to present police with a competing version of the facts, Pontbriand relinquished his right to counsel and reluctantly began to make a series of incriminating statements. Despite the majority's attempts to distinguish the case law, in similar circumstances we have held that such tactics amount to unconstitutional coercion. See *State v. Cox*, 147 Vt. 421, 425, 519 A.2d 1144, 1147 (1986) (suppressing statements where the "defendant was presented with two choices: (1) to await [the arrival of counsel] and forfeit the interview, or (2) to proceed with the interview without additional advice"); accord *Collazo v. Estelle*, 940 F.2d 411, 414, 416 (9th Cir. 1991).

¶ 40. After evaluating the facts of this case against the policy supporting the U.S. Supreme Court's historical rejection of coerced statements and the factors identified in *Medina*, I believe the State has failed to demonstrate that the trial court erred in excluding the statements Pontbriand made to police confirming the substance of his earlier e-mail. See *Gennings*, 808 P.2d at 844 ("[T]he deliberate exploitation of a person's weakness by psychological intimidation can ... constitute a form of governmental coercion that renders a statement involuntary."). In this case, the totality of the circumstances — Pontbriand's illness and confinement in the hospital, the display of the incriminating message, the failure to advise him of his rights to silence and counsel, and the officers' decision to continue questioning after the request for counsel — created a coercive atmosphere sufficient to make his statements involuntary.

¶ 41. The decision to pursue a coercive interrogation strategy in this case is particularly unsettling because the police already had possession of Pontbriand's electronic confession, making his statements from the hospital bed largely redundant. In such circumstances, the better course would have been to simply advise Pontbriand of his constitutional rights, and ask him if he wanted to make any additional statements. Because I do not believe that the State has demonstrated that the chosen strategy, one based on the subtle manipulation and psychological intimidation of a person who is demonstrably ill, passes constitutional muster, I respectfully dissent. I am authorized to state that Justice Dooley joins this dissent.