2008 VT 35

# State of Vermont v. Michael Brillon

[955 A.2d 1108]

No. 05-167

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 14, 2008

Motion for Reargument Denied April 16, 2008

476

478

*William H. Sorrell*, Attorney General, and *David Tartter* and *John R. Treadwell*, Assistant Attorneys General, Montpelier, for Plaintiff-Appellee.

*William A. Nelson*, Middlebury, for Defendant-Appellant.

¶ 1. **Johnson, J.** In this appeal, we take the extraordinary step of vacating the convictions and dismissing the charges against defendant because he was not prosecuted within a time frame that satisfied his constitutional right to a speedy trial. Defendant was charged with domestic assault after striking his girlfriend during an altercation in July 2001. Because his assaultive behavior was also a violation of a previous condition of release, the charge was enhanced to a felony domestic assault. The enhanced felony, in turn, allowed the State to prosecute defendant as a habitual offender, making him eligible for a life sentence. Defendant remained incarcerated during the nearly three years that passed before he was finally brought to trial. Following the trial, he was sentenced to serve twelve-to-twenty years in prison. During the pendency of this appeal, the State agreed to a reduced sentence if defendant dropped his appeal, but, on remand, the district court refused to accept the stipulated settlement. We now hold that the convictions must be vacated and the charges against defendant dismissed because he was not prosecuted in a timely manner.

¶ 2. In arriving at this decision, we acknowledge that much of the delay in prosecuting defendant resulted from the inaction of several of the assigned counsel who represented defendant during the three years he awaited trial. As we discuss in detail below, however, the inaction of assigned counsel does not relieve the state[1] of its duty, through implementation of the criminal justice system, to provide defendant with a constitutionally guaranteed speedy trial. Indeed, the defender general's office is part of the criminal justice system and an arm of the state. When, as in this case, a defendant presses for, but is denied, a speedy trial because of the inaction of assigned counsel or a breakdown in the public

---

[1] We do not capitalize the word "state" when referring to the combination of government entities that make up the criminal justice system. We capitalize the word "State" when referring to appellee. Thus, in this opinion, when we attribute delay to the state, we are referring to the criminal justice system in general and not individual prosecutors, who, for the most part, actively sought to have defendant brought to trial in a timely manner.

defender system, the failure of the system to provide the defendant a constitutionally guaranteed speedy trial is attributable to the prosecution, and not defendant. See *People v. Johnson*, 606 P.2d 738, 747 (Cal. 1980) (en banc) (stating that the purpose of the right to a speedy trial is to protect defendants against delay caused by the willful oppression or neglect of the state or its officers, including "not only the prosecution, but the judiciary and those whom the judges assign to represent indigent defendants").

¶ 3. Because of the limited record before us in this case, we cannot be sure if this case represents an aberration or a growing crisis in the provision of defender general services in Vermont. If it is the result of inadequate resources given to the defender general's office, it would behoove the Legislature to address the problem before we are confronted anew with the dilemma of dismissing charges and prematurely releasing potentially dangerous individuals into the community.

¶ 4. Contrary to the assertion of the dissent, we do not take this decision lightly or in disregard of the role of the trial courts. In the dissent's view, this Court is releasing into society a "woman beater" and "habitual offender" who is guilty of intentionally "sabotag[ing]" his criminal proceedings by "ensnaring" his attorneys in a "ploy" to create conflicts of interest, avoid trial, and ultimately commit a "fraud upon the court" in seeking dismissal based on lack of a speedy trial. *Post*, ¶¶ 52, 54, 59. Apparently, the dissent views the trial court, the state's attorney's office, and the defender general's office as passive players helpless to prevent defendant's "monkey-wrenching" "maneuvers." *Post*, ¶¶ 52, 58. Under such a scenario, the trial court would not appear to have ultimate control over, or responsibility for, its own proceedings. Because of defendant's presumed "tactics," the dissent considers the lengthy delay in securing counsel for defendant "unfortunate, but not per se prejudicial." *Post*, ¶¶ 76, 82. The dissent urges us to remand the case, largely so that its assertions about defendant's motives can be proved at a second hearing on his motion for a speedy trial.

¶ 5. To bolster its theory that defendant is solely responsible for the delay in bringing his case to trial, the dissent examines "related" criminal proceedings involving separate charges and engages in extensive factfinding that attributes motives to defendant. *Post*, ¶ 57. Ironically, at the same time, the dissent accuses

the majority of engaging in "appellate fact finding" and expanding the record in an effort "to render judgment on defendant's bare allegations." *Post*, ¶¶ 57, 58 n.4. Our judgment, however, is not based on "defendant's bare allegations," but rather on the undisputed record in this case, the only case that is relevant to determining the speedy-trial issue. That record includes the entire procedural history of the case — including the trial court's actions, the statements of withdrawing counsel, the periods of time defendant was without counsel, the period of time it took to bring defendant to trial, and the actions of the state's attorney and defendant. The record reveals, as detailed below, that an unacceptable amount of the delay was not attributable to defendant, but to the system. The dissent glosses over these systemic factors, instead attributing the delays to defendant's supposed fraud upon the court — even though nothing in the record or the trial court's findings support this view. What the dissent misses is that, notwithstanding defendant's actions and motives, it is ultimately the trial court's responsibility to control the proceedings by denying new counsel or continuances if it believes that the defendant is attempting to manipulate the system.

¶ 6. Therefore, we see no point in remanding this case for the trial court to revisit defendant's motion to dismiss for lack of a speedy trial. The material facts, apparent from the record, are essentially undisputed. Remanding for a post-conviction-relief-like hearing at which all of defendant's assigned counsel would be examined to uncover defendant's underlying motivations would do nothing to further our resolution of the ultimate legal question we must decide. Rather, the undisputed facts need to be examined in light of the relevant legal factors. After doing so here based on the record before us, it is plain that defendant was not prosecuted within a time frame that satisfied his constitutional right to a speedy trial.

¶ 7. Before examining the relevant law, we first set forth the historical and procedural facts. Later, within the context of applying the relevant factors established by our law, we will review the factual details concerning the delay in prosecuting defendant.

¶ 8. The events that led to this appeal stem from defendant's relationship with his former girlfriend, with whom he had a child born in April 2000. As the result of charges arising from an incident in which defendant allegedly slashed the tires on his

girlfriend's car, the district court imposed, among others, a condition of release prohibiting defendant from harassing his girlfriend. On July 27, 2001, approximately three weeks after the court's imposition of conditions of release, defendant's girlfriend drove defendant to the local police station for a required check-in before they were to return to the girlfriend's mobile home so that defendant could visit their daughter. Apparently, the girlfriend left after dropping off defendant because she was under the impression that he was going to be arrested. Eventually, the girlfriend's sister gave defendant a ride to the girlfriend's mobile home, where defendant angrily confronted the girlfriend for leaving him at the police station. The girlfriend appeared at the door of the mobile home holding a baseball bat. At one point during the confrontation, the girlfriend attempted to leave with her daughter in her car. As she attempted to do so, defendant struck her in the face. The police were called, and defendant was arrested.

¶ 9. Absent aggravating circumstances, a domestic-assault charge is a misdemeanor punishable by no more than one year in prison. 13 V.S.A. § 1042. Due to a combination of circumstances, however, defendant was charged with an enhanced felony and then as a habitual offender facing a potential life sentence. The enhanced felony charge of second-degree aggravated domestic assault resulted from the fact that defendant's assault on his girlfriend also violated the pretrial condition of release prohibiting defendant from harassing his girlfriend. See 13 V.S.A. § 1044(a)(1) (providing that a person is guilty of second-degree aggravated domestic assault if the person commits domestic assault that causes bodily injury to another person and, in doing so, "violates specific conditions of a criminal court order in effect at the time of the offense imposed to protect that other person"). Moreover, because defendant had been convicted of felonies on three prior occasions, the prosecution also charged defendant as a habitual offender. See 13 V.S.A. § 11.

¶ 10. Three days after the July 27, 2001 incident, the district court issued a no-bail order, and defendant remained incarcerated. On February 16, 2002, following an evidentiary bail hearing that had been continued several times, the trial court ordered that defendant be held without bail pending trial. Finally, after several more continuances, changes of attorneys, and rotations of judges, a trial was held over three days beginning on June 15, 2004, nearly three years after defendant had been arraigned. Defendant

was found guilty and sentenced to serve twelve-to-twenty years in prison. On appeal, defendant argues that the trial court erred by (1) denying his motion to bifurcate the aggravating element of the domestic-assault charge, refusing to allow defendant to stipulate to the existence of the aggravating element in lieu of the State's evidence, and improperly instructing the jury regarding that aggravating element; (2) allowing the prosecutor to ask defendant if he had committed perjury in a prior proceeding; (3) refusing to allow defendant to retract his waiver of a jury trial on the issue of whether he was a habitual offender; and (4) denying his motion to dismiss the charges against him for lack of a speedy trial. We need not address the first three issues because our resolution of the speedy-trial issue determines the outcome of the appeal.

¶ 11. Both the federal and Vermont constitutions guarantee defendants a right to a speedy trial. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury . . . ."); Vt. Const. ch. I, art. 10 (persons have a right in all criminal prosecutions to "a speedy public trial by an impartial jury"). There is also a Vermont administrative order establishing time periods for bringing defendants to trial in criminal cases, Administrative Order No. 5 ("PROMPT DISPOSITION OF CRIMINAL CASES"), but this Court has ruled that the order does not grant criminal defendants procedural or substantive rights. See *State v. Snide*, 144 Vt. 436, 441, 479 A.2d 139, 142-43 (1984) (noting that a speedy-trial violation is not predetermined by the operation of Administrative Order No. 5, and that the order cannot be invoked by a defendant as a matter of right).

¶ 12. We apply a well-recognized, albeit amorphous, balancing test set forth by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), and adopted by this Court, to determine whether there has been a violation of the constitutional right to a speedy trial. See *State v. French*, 152 Vt. 72, 77, 564 A.2d 1058, 1060-61 (1989) (noting that the *Barker* test was adopted by this Court). The balancing test weighs the conduct of the prosecution and the defendant while examining (1) the length of the delay, (2) the reason for the delay, (3) the extent to which the defendant asserted the right, and (4) the prejudice to the defendant. See *Barker*, 407 U.S. at 530; *State v. Keith*, 160 Vt. 257, 266-67, 628 A.2d 1247, 1253 (1993).

¶ 13. In employing this test, we have characterized our review as deferential to the trial court and yet have independently examined the record and applied the facts to the law. In so doing, we have routinely stated, without discussion, that we review speedy-trial decisions for an abuse of discretion. E.g., *State v. Beer*, 2004 VT 99, ¶ 33, 177 Vt. 245, 864 A.2d 643; *Keith*, 160 Vt. at 266, 628 A.2d at 1253. Tracking the citations of that standard to previous cases leads us to *State v. Chamberlin*, 131 Vt. 549, 551, 310 A.2d 30, 32 (1973), wherein we held that implementing Administrative Order No. 5's predecessor rule was "entirely within the discretionary authority of the trial court." This holding evolved over time into assigning an abuse-of-discretion standard for reviewing trial court rulings on constitutional speedy-trial claims. Compare *State v. Unwin*, 139 Vt. 186, 195, 424 A.2d 251, 256 (1980) (noting that "Administrative Order 5 permits but does not require a trial court to dismiss a criminal case which has not proceeded to trial within a certain period," and stating that the issue "is for the sound discretion of the trial court, and will not be disturbed on appeal") with *State v. Roy*, 151 Vt. 17, 36, 557 A.2d 884, 896 (1989) (citing *Unwin* standard of review in the context of a speedy-trial analysis); *French*, 152 Vt. at 75, 564 A.2d at 1060 (citing *Roy* for the proposition that a trial court's ruling on a motion to dismiss for lack of a speedy trial is reviewed for an abuse of discretion); *State v. Lavalette*, 154 Vt. 426, 429, 578 A.2d 108, 110 (1990) (same); *Keith*, 160 Vt. at 266, 628 A.2d at 1253 (citing *French* for the same proposition).

¶ 14. While the trial court certainly has the discretion to implement Administrative Order No. 5, and we will defer to the trial court's implementation of that order absent an abuse of that discretion, our review of decisions determining whether a defendant's *constitutional* right to a speedy trial has been violated is not deferential in all respects. In such cases, we are presented with a mixed question of law and fact — that is, whether the trial court's findings are supported by the record and, in turn, whether the record supports the court's legal determination that the defendant was deprived of his constitutional right to a speedy trial. In this sense, the standard of review is analogous to our review of a trial court's ruling on a motion to suppress evidence in a criminal case. See *State v. Pontbriand*, 2005 VT 20, ¶ 12, 178 Vt. 120, 878 A.2d 227 (applying a mixed standard of review to rulings on motions to suppress); *State v. Freeman*, 2004 VT 56, ¶ 7, 177 Vt. 478, 857

A.2d 295 (mem.) (same). Because the trial court, as the factfinder, is in the best position to determine the weight and sufficiency of the evidence, we apply a clearly-erroneous standard to the underlying facts found by the court; on the other hand, we review de novo the ultimate legal question of whether the findings and underlying facts demonstrate a violation of a defendant's constitutional right to a speedy trial. Cf. *Berry v. State*, 2004 WY 81, ¶ 17, 93 P.3d 222 (stating that "the constitutional question of whether a defendant has been denied a speedy trial" is examined de novo). To the extent that our prior case law suggests otherwise, it is overruled.

¶ 15. Having set forth the standard of review, we now examine the four factors that are at the heart of the balancing test for determining whether there has been a violation of the constitutional right to a speedy trial. The first factor, which serves a dual role, is the length of the delay. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530. If the length of the delay is extreme enough to be presumptively prejudicial without regard to the reasons for the delay, it triggers review of the other factors to be balanced in determining whether there is a speedy-trial violation. *Id.*; see *Keith*, 160 Vt. at 267, 628 A.2d at 1253 (noting that because the first factor serves as a trigger for review of the other factors, it is unnecessary to examine the reasons for the delay as part of the length-of-delay calculation). If review of the other factors is triggered, the first factor then is balanced along with the other factors in determining whether a speedy-trial violation exists. See *State v. Stock*, 2006-NMCA-140, ¶ 13, 147 P.3d 885 (applying same test to evaluate speedy-trial claim under New Mexico Constitution).

¶ 16. In weighing the length of the delay, we must consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim," *Doggett v. United States*, 505 U.S. 647, 652 (1992), as well as the nature of the case. See *Barker*, 407 U.S. at 531 (noting that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge"); *Stock*, 2006-NMCA-140, ¶ 14 ("Where a case is simple and relatively easy to prosecute, delay will weigh more heavily against the State

because there is less excuse for delay."). Irrespective of the reason for the delay, egregious delay in bringing an incarcerated defendant to trial must be factored against the state in a speedy-trial analysis because, as the Supreme Court emphasized in *Barker*, it is ultimately the government's responsibility to bring a defendant to trial in a timely matter. See 407 U.S. at 529 (holding that "the primary burden [is] on the courts and the prosecutors to assure that cases are brought to trial"); *Stock*, 2006-NMCA-140, ¶ 17 (holding that because the state has the ultimate responsibility of bringing defendants to trial in a timely manner, "the sheer fact of lengthy incarceration or other restraint on liberty should count for something in the speedy trial analysis" even when the defendant bears some responsibility for the delay).

¶ 17. As the trial court, the parties, and the dissent acknowledge in this case, the three-year delay in bringing defendant to trial far exceeds the minimum length of delay necessary to trigger review of the other factors. See *Keith*, 160 Vt. at 267, 628 A.2d at 1253 (holding that twenty-month delay "far exceeds the length of delay needed to trigger a review of the other three factors"); *Unwin*, 139 Vt. at 195, 424 A.2d at 257 (holding that "a delay of more than six months in a case involving an incarcerated defendant is long enough to require that the other factors be considered"). Moreover, because the length of the delay is extreme and the case is not particularly complex, this factor weighs heavily in favor of defendant. Cf. *Stock*, 2006-NMCA-140, ¶ 18 (stating that the first factor weighs heavily in favor of the defendant because "the three and one-half year delay in this [simple] case was particularly egregious").

¶ 18. The second factor — the "flag all litigants seek to capture," *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986) — is the reason for the delay. Deliberate delay on the part of the state intended to hamper the defense would obviously weigh heavily in favor of defendant. *Barker*, 407 U.S. at 531. More neutral reasons for delay, such as overcrowded courts, "should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government." *Id.* Courts have applied the same reasoning with respect to the crowded calendars of public defenders. E.g., *Johnson*, 606 P.2d at 747 (holding that the right to a speedy trial "may also be denied by failure to provide enough public defenders

or appointed counsel, so that an indigent [defendant] must choose between the right to a speedy trial and the right to representation by competent counsel").

¶ 19. For example, in *Stock*, the court considered "the difficult question of whether a defendant's constitutional right to a speedy trial is violated when he is incarcerated and awaiting trial for more than three years, but the delay is in part attributable to the neglect of his overworked public defenders." 2006-NMCA-140, ¶ 1. Much of the delay in that case resulted from the defendant's assigned counsel seeking numerous continuances and failing to proceed expeditiously with the case. The court stated that it would be unfair to attribute the delays to the defendant when they were "solely attributable to his counsel" and were not for the defendant's benefit. *Id.* ¶ 21. Similarly, in *Middlebrook v. State*, 802 A.2d 268 (Del. 2002), the Delaware Supreme Court addressed a speedy-trial claim in a case in which an incarcerated defendant waited nearly four years for trial because of several problems, including the trial court's delay in ruling on a pretrial motion, the rotation of the case among several judges, and the granting of eleven continuances, several of which were requested by defense counsel. While acknowledging that a significant part of the delay resulted from continuances sought by defense counsel, the court concluded that this fact had to be weighed against the state, which had the ultimate responsibility to bring defendant to trial in a timely manner. *Id.* at 274-75; see also *State v. Magnusen*, 646 So. 2d 1275, 1281 (Miss. 1994) ("A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." (Emphasis omitted.))

¶ 20. With these principles in mind, we examine the reason for the delay in the instant case. Defendant was arraigned on July 30, 2001, three days after the incident that led to the charges against him. He remained in prison on a hold-without-bail order through his trial, which took place in June 2004. At the arraignment, the district court ordered that defendant be held without bail pending an evidentiary hearing, which defense counsel asked to be held at a later date. The evidentiary hearing was scheduled for August 15, but on August 14 the prosecutor and the public defender stipulated to continuing the hearing because defense counsel was moving his former private practice that day. Defense counsel

indicated that defendant, although incarcerated, had consented to the continuance. On September 24, defendant filed a letter with the court complaining that he had been held without bail for more than sixty days, and yet, notwithstanding numerous telephone calls and letters, his counsel had not contacted him or engaged in any discovery in preparation of his defense.

¶ 21. A bail hearing was convened on October 2, but before the hearing began, defense counsel asked that the hearing be continued because he intended to file a motion to recuse the judge, who had also presided over a relief-from-abuse proceeding stemming from the same incident that led to the criminal charges. Defense counsel explicitly stated that delay resulting from the motion would not be counted toward any speedy-trial claim. The next day, defendant filed a pro se motion to recuse the trial judge, which was denied by the trial judge on October 9 and by the administrative judge on November 20. On December 28, noting that defendant had been incarcerated for five months without even having had a bail hearing, the State asked that the matter be set for trial in February 2002. The court tentatively scheduled the trial for February.

¶ 22. The bail hearing was finally held on January 16, 2002. That same day, the court issued a written opinion denying bail. The next day, defense counsel sought a continuance of the February trial, arguing that further investigation was necessary to prepare for trial. The trial court denied the motion and set the jury draw for February 26, with the trial to begin the next day. On February 22, defense counsel again filed a motion to continue, asserting that his case load had made it impossible for him to prepare for trial. He assured the court that defendant understood that delay resulting from the motion would not count with respect to any potential speedy-trial claim. Again, the district court denied the motion, noting that defense counsel had had ample time to prepare for trial. Defendant, who was participating by telephone in the hearing on the motion to continue, expressed frustration at his counsel's inability to be ready for trial, finally telling him that he was fired.

¶ 23. Three days later, the day before the scheduled jury draw, counsel filed a motion to withdraw, stating that there might be a conflict of interest and that defendant had discharged him because of defendant's unhappiness over his not being ready for trial. He also reported that the defender general had suggested reassigning

the case to another attorney whom he had in mind. At the hearing on the motion, the court warned defendant that granting the motion to withdraw would mean further delay. The court asked defendant whether he would rather have a new attorney than go forward with his current attorney. Defendant responded that he had no choice because his current attorney was not prepared to go forward with a trial. The court then granted the motion to withdraw, appointed a new attorney, and ordered a status conference to be held in thirty days. A few days later, the newly assigned counsel reported a conflict of interest, and on March 1, the court appointed a third attorney to represent defendant.

¶ 24. Nearly three months later, on May 20, defendant filed a pro se motion seeking yet another attorney because of his third attorney's alleged failure to communicate with defendant, to file motions, or to share any discovery material so that defendant could make informed decisions regarding his defense. Defendant claimed in the motion that his third attorney had told him that he (the attorney) could not be diligent because of his heavy case load. A hearing on the motion was held on June 11. Complaining that his attorney had spoken to him on only two occasions for a few minutes since being assigned in March, defendant told the court that he wanted to be brought to trial. For his part, defense counsel stated that he had spoken to defendant at length about trial strategy and that he would make prior deposition testimony available to defendant. He further stated that he had ample time before trial to file a motion in limine and that he would look at whether the habitual-offender charge could be attacked. Near the end of the hearing, defense counsel moved to withdraw from the case, indicating that defendant had threatened him during a break in the proceedings. The court granted the motion to withdraw because of an irreconcilable breakdown in the attorney-client relationship, but warned defendant that he was not entitled to manage every aspect of his defense and that assigning a new attorney would result in further delay. That same day, the court appointed a fourth attorney to represent defendant.

¶ 25. At a status conference on August 5, defendant's fourth counsel stated that he needed an additional sixty days to prepare for trial because of his heavy case load and because "there seems to be a lot of discovery that [defendant's] prior attorneys never got to for one reason or another." The State asked the court to allow a minimal amount of time for further discovery, noting that

defendant was seeking to depose peripheral witnesses for the sole purpose of attacking the victim's character. The court ordered the defense to disclose its additional witnesses by September 16 and indicated that it expected the case to be tried in October. On August 28, defendant wrote a letter to the trial court expressing concern that his new counsel had not contacted his witnesses and had not responded to his calls or letters. Two months later, on October 22, with no intervening action of any sort indicated in the docket, defendant filed a motion to dismiss his counsel because the attorney had not responded to numerous attempts to contact him and had done nothing to prepare for trial.

¶ 26. A hearing on the motion was scheduled for November 26. The fifth judge to take part in this case presided at the hearing. Defense counsel indicated that he was in the process of getting out of the private practice of criminal defense work and that his contract with the defender general's office had expired in June. He further stated that the defender general had indicated to him that he was going to reassign the case to someone more capable of dealing with it. Without making any findings regarding the adequacy of the current attorney's representation of defendant, the trial court granted the motion to withdraw and instructed the defender general to assign another counsel — defendant's fifth — as soon as possible.

¶ 27. A court docket entry indicates that the defender general assigned a new attorney to represent defendant that day, November 26, but at a January 8, 2003 status conference, that attorney told the court that he had been advised in December 2002 only that he might be assigned to the case. Apparently, he had been told to review the case file to see if he had a conflict, but he had not yet received the file. The attorney stated that he would review the case as soon as he was formally assigned to represent defendant. The court ordered the defender general's office to assign a new counsel within fourteen days. On January 15, the defender general advised the court that the fifth counsel had been assigned to the case, and the court issued a formal notice of the assignment a week later. On February 25, the new counsel filed a motion to extend discovery and motion deadlines, stating that he had been out of state the previous three weeks. The court granted the motion, noting the State's acquiescence.

¶ 28. On April 11, 2003, four and one-half months after the previous attorney's withdrawal and without having done anything

in the case, defendant's fifth attorney filed a motion to withdraw, stating that the defender general would be securing new counsel because of modifications in his firm's contract with the defender general's office.[2] For the following four months, defendant was entirely without counsel. On May 7, defendant filed a pro se motion to dismiss his case in the interests of justice, citing the delay in bringing him to trial. On June 20, the defender general notified the court that it had obtained funding from the Legislature for a serious felony unit and that a new attorney would be hired for the position and could represent defendant commencing on August 1. The new attorney, defendant's sixth, appeared at an August 11 status conference, at which the court scheduled another status conference to give the new attorney a chance to review the case.

¶ 29. At the next status conference on September 8, the attorney noted a need for further discovery and asked for more time to make sense of the file. The court told defense counsel to review all pending motions and inform the court by November 7 which ones needed to be ruled on. On November 5, the court accepted a stipulation by defense counsel and the State to extend the November 7 deadline to December 22. At a December 8 status conference, the deadline was extended another sixty days because the files were incomplete and additional documents were needed from the State and previous defense attorneys. A further stipulated extension of the deadline to February 20, 2004 was granted. On February 23, defense counsel filed a motion to dismiss for lack of a speedy trial and in the interests of justice. The trial court denied the motion in an April 19 decision, ruling that much of the delay in bringing defendant to trial was the result of defendant's own actions and that defendant had failed to demonstrate actual

---

[2] Meanwhile, in April 2003, the State filed an information charging defendant with a violation of an abuse-prevention order and as a habitual offender. A separate docket was opened, and defendant was appointed a different public defender. Citing irreconcilable differences with defendant, the attorney filed a December 2003 motion to withdraw, which the court denied. The case went to trial in February 2004, but defendant's attorney filed another motion to withdraw during the hearing because of defendant's displeasure with his representation. The State did not file a response within the time frame set by the court, and in March 2004 the court granted the motion to withdraw, declared a mistrial, and assigned the matter to the public defender who had recently been assigned to represent defendant on the other pending charges. In July 2005, the State dismissed the violation-of-an-APO charge with prejudice.

prejudice as a result of the pretrial delay. In so ruling, the court also emphasized that defendant's repeated demands for a speedy trial had been made in the absence of a request for trial from counsel or a statement from counsel indicating that they were ready for trial.

¶ 30. Defendant's trial finally took place in June 2004, after which he was convicted and sentenced to a twelve-to-twenty-year term of incarceration. While the appeal was pending, the State and defendant stipulated that the sentence would be reduced by half if defendant dropped the appeal, but, on remand from this Court, the trial court refused to accept the stipulation.

¶ 31. Before considering to whom the delay should be attributed and how much weight should be given to this factor, we note that the trial court, in denying defendant's speedy trial motion, merely listed the number of factors attributable to the delay and then summarily concluded that most of the delay was attributable to defendant. We disagree with this conclusion to the extent that the trial court attributed to defendant the failure of his attorneys to move his case to trial. Examining specific periods of time, we conclude that the period between July and November 2001 should not count against the state because much of the delay during that period was the result of defendant's motion to recuse the trial judge. Further, the period between November 2001 and February 2002 should not count heavily, if at all, against the state because both the prosecution and the court diligently attempted to move the case forward during that time; on the other hand, the case did not move forward because of defense counsel's failure to be ready for trial, not because of defendant's actions. Nor should the period between February and June 2002 count against the state because the trial court was compelled to allow the new assigned counsel to withdraw after defendant threatened him during a break in the proceedings. The record reveals, however, that the attorney did very little to move defendant's case forward during the several months he represented defendant, notwithstanding defendant's persistent demands to be tried. The dissent repeatedly refers to these time periods in support of its position that defendant intentionally sabotaged the criminal proceedings against him, but we do not count them against the state.

¶ 32. Nevertheless, even assuming that none of the above time periods can be counted against the state, most of the remaining two years can and should be, notwithstanding the State's argu-

ment to the contrary. According to the State, the only period of delay that should not be attributed to defendant is an eight-month delay between November 2002 and July 2003 resulting from uncertainty over the assignment of new counsel for defendant. Further, the State contends that even that delay was for "neutral" reasons and thus should not be weighed heavily against the government. In the State's view, the other periods of delay between June 2002 and June 2004 should be attributed to defendant because they resulted from defendant's practice of dismissing attorneys either immediately before trial or before they had an opportunity to review his case. The State describes defendant's dissatisfaction with his attorneys as resulting from their unwillingness to adopt his questionable trial strategy and tactics.

¶ 33. Our review of the record as detailed above does not comport with this assessment of the facts, which is not based on any trial court findings. While we recognize that defendants may attempt to manipulate the system by creating delay that could conceivably support later speedy-trial claims, the record does not support the State's suggestion that this occurred here, and the district court made no such finding. To the contrary, the record reveals that defendant consistently sought to be tried by competent counsel as quickly as possible. While defendant moved for the removal of several of the attorneys assigned to his case, he did so because they did not do anything to move his case forward, not because of any disagreements he may have had with them over trial strategy, as the State contends.

¶ 34. To emphasize this point, we summarize the relevant and material facts of the two-year period between June 2002 and June 2004, keeping in mind that defendant had already been incarcerated at the *start* of that period for nearly a year on a felony charge stemming from a violation of a pretrial condition of release. Defendant's fourth attorney, who was assigned in June 2002, stated at an August 2002 status conference that he needed an additional two months to prepare the case, and yet he apparently did little or nothing and finally conceded at a November 2002 status conference that his contract with the defender general had expired and he was giving up criminal defense work. A fifth attorney was not formally assigned until January 2003, and he was allowed to withdraw four and one-half months later without having done anything because of a change in his contract

with the defender general's office. At that point, defendant had been incarcerated without a trial for approximately two years, and yet he was entirely without counsel for the next four months until the next assigned counsel took over in August 2003. Despite the already significant delay, the prosecution stipulated to several more continuances before a trial was finally held in June 2004.

¶ 35. Given these facts, we conclude that a significant portion of the delay in bringing defendant to trial must be attributed to the state, even though most of the delay was caused by the inability or unwillingness of assigned counsel to move the case forward. The defender general's office is part of the criminal justice system, and ultimately it is the court's responsibility to assure that that system prosecutes defendants in a timely manner that comports with constitutional mandates. While some of the delay in this case certainly is attributable to defendant, a significant portion is attributable to the criminal justice system provided by the state. Although this factor does not weigh heavily against the state because the delay was not the result of a deliberate attempt to hamper the defense, nor do we consider it "neutral," in light of the state's ultimate responsibility to prosecute defendant in a timely manner.

¶ 36. In arguing that defendant was responsible for most of the delay, the State relies on *State v. Trombly*, where we held that "delay arising out of the relationship between attorney and client must be attributed to the defendant, and omitted from consideration." 148 Vt. 293, 300, 532 A.2d 963, 967 (1987), *abrogated on other grounds by State v. Tahair*, 172 Vt. 101, 105-10, 772 A.2d 1079, 1082-86 (2001). *Trombly* is not comparable to the instant case. In *Trombly*, we excluded from consideration a two-month period occasioned by changes in assigned counsel after the discovery of a conflict of interest. *Id.* at 299, 532 A.2d at 967. We also excluded a relatively brief period caused by the defendant discharging his attorney and later accusing the attorney of "conspiring with the state's attorney against him." *Id.* at 300, 532 A.2d at 967.

¶ 37. By contrast, in this case, defendant's trial was delayed for several months, even years, because of the failure of several assigned counsel to do anything to move his case forward. As discussed above, defendant consistently requested that he be tried promptly. He sought the removal of his attorneys only after a

significant period of time passed without them doing anything in his case. Thus, not only is the length of the delay significantly different in the two cases, but so are the reasons for the delay. Rather than stemming from ordinary delays occasioned by changes in assigned counsel or problems with an attorney-client relationship caused by the defendant's unfounded conspiracy claims, the delays in this case were caused, for the most part, by the failure of several of defendant's assigned counsel, over an inordinate period of time, to move his case forward.

¶ 38. The third factor "examines the aggressiveness with which the defendant asserted his right to a speedy trial." *Keith*, 160 Vt. at 268, 628 A.2d at 1254. Here, as revealed by the detailed facts set forth above, defendant repeatedly and adamantly demanded to be tried, and eventually filed motions to dismiss for a lack of a speedy trial, both pro se and through counsel. In past cases, we have emphasized "that a motion to dismiss for lack of a speedy trial is not the equivalent of a demand for an immediate trial." *Id.* In this case, however, from early on and on several occasions, defendant stated unequivocally that he wanted to be tried as soon as possible. When his attorneys did not move his case forward within a reasonable period of time, he asked the court to replace them with someone who would. While defendant grudgingly consented to continuances to allow his attorneys to prepare his case, he did so only because it was apparent that the attorneys, by their own admission, were not prepared to go forward with a trial. Cf. *Johnson*, 606 P.2d at 744 (holding that an attorney may not waive a defendant's right to a speedy trial to accommodate the interests of other clients rather than benefit the defendant). Just as a defendant cannot be forced to choose between the right to counsel and the right to forego an insanity defense, see *State v. Tribble*, 2005 VT 132, ¶ 33, 179 Vt. 235, 892 A.2d 232 (holding that the trial court erred by treating the defendant's refusal to proceed with an insanity defense as a waiver of his right to counsel), defendant cannot be forced to choose between his right to a speedy trial and his right to effective counsel. As the en banc California Supreme Court stated, a defendant's right to a speedy trial may be denied by the failure of the state to provide "enough public defenders or appointed counsel, so that an indigent [defendant] must choose between the right to a speedy trial and the right to representation by competent counsel." *Johnson*, 606 P.2d at 747-48 ("A defendant

deserves not only capable counsel, but counsel who, barring exceptional circumstances, can defend him without infringing upon his right to a speedy trial.").

■ ¶ 39. In this case, the record plainly demonstrates that, from early on, defendant aggressively asserted his right to a speedy trial; accordingly, this factor weighs in favor of defendant. In its brief discussion of this third factor, the trial court noted defendant's "repeated requests to proceed to trial, usually without any such demand from his then counsel." Apparently, the court intended this statement to support its weighing the third factor against defendant. For the reasons stated above, we disagree with the court's conclusion.

■ ¶ 40. Our analysis of the most important and final factor — the extent to which the defendant was prejudiced by the lack of a speedy trial — requires clarification in light of an apparent conflict between federal law and statements made in our past cases. In *State v. Franklin*, 136 Vt. 568, 570-71, 396 A.2d 138, 139 (1978), this Court held that "[t]he passage of over eighteen months from citation to trial, not brought about by the defendant, is so long as to constitute prejudice as a matter of law and a violation of the defendant's constitutional rights." We later over-ruled *Franklin* to the extent that it established the "use of a per se test" for finding prejudice. *State v. Percy*, 158 Vt. 410, 420, 612 A.2d 1119, 1126 (1992). We emphasized in *Percy* that the balancing test set forth by the United States Supreme Court and adopted by this Court requires a weighing of each of the individual factors to determine whether a defendant's constitutional right to a speedy trial has been denied. *Id.*

¶ 41. Unfortunately, some of the statements we made in later speedy-trial cases moved toward the opposite extreme, suggesting that an explicit showing of actual prejudice is a prerequisite to finding a speedy-trial violation. It began in *Keith*, 160 Vt. at 270, 628 A.2d at 1255, with this Court noting that "courts are reluctant to resort to the radical remedy of dismissal — the only remedy available to them," and stating "that the constitutional right to a speedy trial is virtually nonexistent when prejudice to the defense is absent." Later, we dropped the "virtually nonexistent" qualifier and cited *Keith* for the proposition that "[w]here there is no prejudice to the defense at trial, a speedy-trial claim cannot prevail." *State v. Turgeon*, 165 Vt. 28, 35, 676 A.2d 339, 343 (1996);

see *State v. Crannell*, 170 Vt. 387, 408, 750 A.2d 1002, 1019 (2000) (quoting *Turgeon* for the same proposition).

¶ 42. We now overrule these cases to the extent that they suggest that demonstrating actual prejudice at trial is a prerequisite in all cases to finding a speedy-trial violation under the United States Constitution. That proposition has been explicitly rejected by the United States Supreme Court. In *Barker*, the Court stated that claims of prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect," including "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." 407 U.S. at 532. While acknowledging that prejudice pertaining to the last interest was the most serious, *id.*, the Court emphasized that none of the four factors, including prejudice, is "either a necessary or sufficient condition to the finding of a deprivation of the right of a speedy trial," *id.* at 533. Rather, the Court cautioned, the related factors "must be considered together with such other circumstances as may be relevant. . . . in a difficult and sensitive balancing process." *Id.*

¶ 43. Later, the Court reaffirmed that in *Barker* it had "expressly rejected the notion that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right to a speedy trial." *Moore v. Arizona*, 414 U.S. 25, 26 (1973) (per curiam) (holding that the state court committed a "fundamental error" in concluding that a showing of prejudice to the defense at trial was essential to establishing a speedy-trial claim). More recently, the Court has emphasized that "consideration of prejudice is not limited to the specifically demonstrable, and . . . [that] affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett*, 505 U.S. at 655. In explaining this principle, the Court noted that "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.' " *Id.* (citing *Barker*, 407 U.S. at 532). "Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.*; see 5 W. LaFave, et al., Criminal Procedure § 18.2(e), at 132 (3d ed. 2007) (stating that *Doggett* "makes it clear" that the prejudice factor

may favor a defendant even absent any affirmative showing that the delay weakened the ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence).

¶ 44. With this in mind, we now examine defendant's claims of prejudice in the instant case. Defendant asserts prejudice both in his lengthy pretrial incarceration, in and of itself, and further in the impairment of his defense at trial because of the possible loss of memory of key witnesses. The trial court ruled that defendant failed to demonstrate that his defense had actually been impaired to any degree. With regard to certain witnesses whom defendant claimed may have been able to present exculpatory testimony but for the delay in bringing him to trial, the court ruled that defendant's arguments were too attenuated to demonstrate prejudice.

¶ 45. In considering the extent to which defendant has demonstrated prejudice, we cannot ignore the significant period of time that he remained incarcerated pending trial. See *Barker*, 407 U.S. at 532-33 (stating the obvious disadvantages of lengthy pretrial incarceration, including the detrimental impact on the individual and the inevitable hindrance in preparing a defense); *Berry*, 2004 WY 81, ¶ 48 ("Lengthy pre-trial incarceration is one of the factors giving rise to prejudice. It is a separate and distinct factor from pre-trial anxiety . . . ."). "As the length of delay increases, the presumption of prejudice grows stronger and the degree of actual prejudice that must be shown becomes correspondingly lesser." *Stock*, 2006-NMCA-140, ¶ 38. Here, even excluding the delay resulting from defendant's own actions, the length of the delay was egregious, particularly when one considers that defendant was incarcerated and entirely or effectively without counsel for substantial periods of time.

¶ 46. The State argues that we should give less weight to defendant's lengthy pretrial incarceration because he was also being held on other charges that reduced his chances of being freed on bail pending trial. We agree with defendant that the State's argument is speculative. The charges that the State refers to stemmed from defendant's allegedly driving within 1000 feet of his girlfriend's house in violation of an abuse-prevention order and then asking a friend to tell police that it was him (the friend), and not defendant, who drove by the girlfriend's house. In July 2000, bail was set on the first charge at $5000, with conditions of

release. The same amount was set on the second charge in May 2001, concurrent to the first charge. The first charge was initially dismissed without prejudice in May 2001 and eventually dismissed with prejudice, as was the second charge. The State's suggestion that defendant would have been detained for nearly three years irrespective of the delay in this case is pure speculation.

¶ 47. Defendant also claimed that the excessive delay impeded his ability to mount a defense against the charges, contending that the delay had caused one witness's memory to fade and had prevented him from obtaining the testimony of at least one other witness. Defendant's principal claim concerns a corrections officer who saw defendant shortly after the incident that led to the domestic-assault charge. In a deposition, the officer testified that defendant had showed him a bruise on his back caused by being struck by a baseball bat. The officer further testified that he thought, but was not sure, that defendant had claimed he was struck by his girlfriend. Before trial, the defense represented to the trial court that the officer would testify that, upon admission to the prison facility, defendant showed the officer a red mark across his back and told the officer that his girlfriend had struck him with a baseball bat. The court reserved ruling on the admissibility of the hearsay statements until it heard them. As it turned out, however, the officer was unable to testify by the time of trial because of his physical condition, and the trial court ruled that the hearsay statements were inadmissible. Defendant also claims prejudice in that he was not able to locate one of the police officers who was at the scene of the domestic assault and who allegedly would have been able to provide exculpatory testimony as to what occurred.

¶ 48. In rejecting defendant's speedy-trial claim, the trial court ruled that defendant's arguments were too attenuated to demonstrate the degree of prejudice necessary to dismiss the charges against him. We agree with the court that, standing alone, defendant's claims of evidentiary prejudice, although fairly specific, do not appear to be substantial. We caution, however, that even moderately speculative claims of evidentiary prejudice must be given careful consideration because of the difficulty in demonstrating time's erosion of potentially exculpatory testimony. *Middlebrook*, 802 A.2d at 277 (stating that whether a delay has hurt the defense cannot be resolved with mathematical precision, given that evidentiary prejudice is the most difficult form of

speedy-trial prejudice to prove); 5 LaFave, *supra*, § 18.2(e), at 131 (stating that "courts should not be overly demanding with respect to proof of [evidentiary] prejudice").

¶ 49. In light of the entire circumstances in this case — particularly defendant's lengthy pretrial incarceration, much of which is not attributable to defendant — we conclude that the prejudice factor must be weighed against the state. Cf. *People v. Charles*, 580 N.Y.S.2d 99, 103 (App. Div. 1992) (stating that although the defendant's claim of evidentiary prejudice was somewhat speculative, that fact is not significant because of the state's failure to show good cause for the significant delay between the defendant's arrest and trial). Although defendant raises some legitimate, albeit speculative, claims regarding prejudice to his defense, the principal reason that prejudice exists in this case is because of the inordinate delay in prosecuting him while he was incarcerated.

¶ 50. In sum, each of the four principal *Barker* factors weigh against the State in this case. Accordingly, we are reluctant, but compelled, to exercise the extraordinary remedy of dismissing the charges in a case involving a habitual offender who was convicted of what we consider to be a very serious criminal offense — aggravated domestic assault. See *Barker*, 407 U.S. at 522 (stating that the "amorphous" quality of the constitutional right to a speedy trial leads to "the unsatisfactorily severe" but "only possible remedy" of dismissal of the indictment). We note that although the trial court acted well within its authority and discretion in rejecting the stipulation that would have dismissed this appeal in exchange for reducing defendant's sentence by half, defendant has already served approximately one half of his sentence. We are concerned, however, that the circumstances resulting in the dismissal of the charges in this case could conceivably arise again, perhaps in a case involving a murder or another serious felony.

¶ 51. We within the criminal justice system, and particularly the judiciary, have the duty and responsibility to assure that this does not happen. See American Bar Association, Standards for Criminal Justice, Standard 12-1.2, commentary at 12-9 (2d ed. 1986) ("The trial court should be vested with absolute (not merely ultimate) responsibility over the trial calendar."). To the extent that what happened in this case is not an aberration but rather

the result of a lack of funding to support the criminal justice system in this state, we encourage the Legislature to examine any unfulfilled needs and address the problem. See generally Gideon's Broken Promise: America's Continuing Quest for Equal Justice, A Report on the American Bar Association's Hearings on the Right to Counsel in Criminal Proceedings (2004) (concluding that thousands of individuals are processed through America's courts every year with either no lawyer or lawyers who do not have the time, resources, or inclination to provide effective representation).

*The district court's decision denying defendant's motion to dismiss for lack of a speedy trial is reversed and the matter is remanded to the district court with directions to set aside the convictions, vacate the sentence, and dismiss with prejudice the charges against defendant in this criminal case.*

¶ 52. **Burgess, J.,** dissenting. Today the majority frees a convicted woman beater and habitual offender, not because of any infirmity in the evidence or unfair prejudice in the trial by which a jury found him guilty, but because the defendant delayed the proceedings for almost twenty-two months. Despite repeated early efforts by the prosecution and the court to commence trial, defendant engaged in a pattern of disqualifying his lawyers and monkey-wrenching his scheduled trials in this and related cases. The defender general's inability to secure additional lawyers in the middle of defendant's postponement may have delayed this matter for another ten to fourteen months, but this gap in assigned counsel resulted in no demonstrated prejudice to defendant or his case. Nor is the majority's release of defendant compelled under the Speedy Trial Clause by any other factor dictated by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). Because the majority vacates the conviction and dismisses the charge when the law does not require it, I respectfully dissent.

¶ 53. The majority insists that it relies upon the "undisputed record" in this case, *ante*, ¶ 5, but cannot point to any fact in that record, apart from defendant's unproven assertions, to support defendant's claim that his own repeated postponements of trial were due to unpreparedness, caseload, or lack of diligence on the part of his assigned counsel. Nor can the majority point to any fact in that undisputed record justifying defendant's forced disqualification of his first two lawyers and his election to skip two

scheduled trials. From that same record, the majority cannot cite a single example of undue prejudice to defendant, personally or to his defense, violative of his speedy trial rights as defined by *Barker*. Remand is not, as suggested by the majority, a pretext to affirm the conviction; rather, it is necessary to establish whether the facts required by *Barker*, and missing here, exist to reverse on speedy trial grounds.

¶ 54. The majority posits that the trial court could have exerted more control over its docket by denying new counsel when defendant disqualified his court-appointed lawyers by manufacturing unnecessary ethical conflicts. *Ante*, ¶ 5. If the majority is serious on this point, then the trial court and the defender general had no further obligation to secure a replacement lawyer after defendant disqualified his first and second assigned counsel by insisting on a position that one could not ethically represent and by threatening the other. Defendant could have demanded immediate trial or invoked his right to self-representation at any time, but did neither. Instead, defendant insisted on the assistance of counsel to which he was no longer entitled. That he purports now to be dissatisfied with the time it took to overcome his sabotage is hardly of constitutional import and certainly no violation of the Sixth Amendment.

¶ 55. The majority's contrary assertion notwithstanding, the lion's share of delay in this case is attributable to defendant, and not to the state. Nearly a year passed without trial between arraignment on July 30, 2001 and the appointment of a third counsel in June 2002, on account of defendant's requests for continuances, his motions to replace counsel on the eve of one trial and several months before his anticipated second trial date, his additional motions practice, and defendant's avoidance of trial by his tactic of forcing counsel to resign. Defendant threatened his second lawyer, leading him to withdraw from the case, and conversed with his first lawyer in such a way as to preclude that counsel's zealous representation. The final eleven months before trial is entirely attributable to defendant as time during which his last assigned counsel requested repeated extensions, prepared for trial and filed motions — none of which was challenged by defendant as unreasonable or less than diligent.

¶ 56. Defendant's claims of ineffective assistance of counsel to justify dismissal of his lawyers were not substantiated by the trial court. Somehow, now, these same claims are accepted by the

majority at face value without supporting evidence.[3] It is not for this appellate court, but for the trial court, to make evidentiary findings regarding post-trial claims that incompetent counsel led to an undue delay of trial. See *State v. Boyea*, 171 Vt. 401, 427, 765 A.2d 862, 880 (2000) (Johnson, J., dissenting) ("[I]t is not our job to supplement the record. . . . This constraint is inherent in the nature of an appellate court; we must bow to the controlling force of the record and consider only those facts that were established below.") (quotations omitted). The trial court never reached that particular issue when addressing defendant's motions to dismiss for lack of speedy trial, basing its decision instead on defendant's own contributions to the delay and the lack of any actual prejudice to the defense from the delay. The majority's further assumption that more than two years of delay is attributable to ineffective representation is plainly contradicted by the record. When the trial court did consider whether counsel was ready for trial in a pretrial motion, it rejected defendant's claims that his lawyer was unprepared. That ruling is not challenged. Defendant's subsequent complaint — that assigned counsel were too overworked to adequately represent him — was found by the court to be unsupported by the evidence. That determination is not challenged. No ruling was reached on defendant's claim that his second lawyer was ineffective, because defendant threatened that lawyer, leading him to withdraw from the case, when defendant could not prove his allegations of inattention and incompetence. The majority's undisputed record shows that defendant demonstrated no professional inattention in the work of his first two lawyers. The majority nevertheless assumes nonfeasance, despite the trial court's unchallenged conclusion to the contrary.

¶ 57. In the course of its appellate fact finding, the majority omits or ignores several matters relevant to its concern that either the court or the defender general neglected defendant's legal welfare. The immediate case was one of three related

---

[3] This error is reminiscent of a similar situation in *State v. Cadorette*, where a majority of this Court inferred prejudice, without any evidence, from the defendant's unproven claim of ineffective assistance of counsel. 2003 VT 13, ¶¶ 11-15, 175 Vt. 268, 826 A.2d 101 (Morse, J., dissenting) (pointing out that "on this record we have no way of knowing what happened during the course of the prosecution and defense," that "[t]he Court assumes defendant was woefully defended based on colloquies outside the context of a fact-finding hearing," and that "this Court has jumped the gun and denied the State an attempt to defend against the ineffective assistance of counsel claims alleged by defendant").

prosecutions pending against defendant and involving the same complainant — one older felony, and a newer habitual-offender felony filed in April 2003. In its May 12, 2003 entry order in this and *all* pending cases against defendant, the trial court acknowledged difficulties in finding counsel to assign to the instant case but, taking advantage of the fact that the local public defender was not conflicted off the new, habitual-offender felony, assigned the public defender to that case and prioritized it to be tried first. Thus, despite unavailable counsel and lack of progress in the instant case during 2003, the court strove to bring defendant to trial on the related docket. In the same entry order, the trial court also noted that defendant was

> held for lack of bail in *this* [the new habitual-offender] docket as well as the others. Should his bail status change so that he is being held *solely on those cases for which the defender general has yet to provide representation*, the court will immediately schedule a bail review hearing in those cases.

(Emphasis added.) Defendant reported no change in bail status to the court.

¶ 58. But for defendant's repeated maneuvers to dismiss his lawyers and avoid trial through the first eleven months following arraignment, the difficulty in finding additional counsel would not have arisen. At least twice in this case, and in two related cases, defendant tried to avoid scheduled trials by claiming without success that his lawyers were incompetent, unprepared or over-worked.[4] Failing in those efforts, defendant next undertook to disqualify his counsel by threatening one lawyer, and, as in yet

---

[4] The majority's expansion of the record to render judgment on defendant's bare allegations, rather than on evidence presented or findings made below, should welcome consideration of relevant docket entries and transcripts from defendant's related cases covered by the May 12, 2003 entry order in this case. That the records of the companion cases were not incorporated into the appellate presentations here is no surprise given that the parties had no reason, then, to expect fact finding by this Court on the merits of defendant's factual claims. The majority opens the door. The companion cases were referred to by the parties as influencing bail and impacting trial in this case, so let us examine the total circumstances of delay as called for by *Barker*. Examination of that record only illustrates that the majority jumps to its assumption of government neglect of an accused anxious for trial without the benefit of evidence and without the context of what was actually afoot in the trial court at the time.

another related case, by putting his other assigned counsel in an ethical bind to preclude or impede continued representation.[5]

¶ 59. As indicated by the majority, defendant's third and fourth counsel appeared to accomplish little or nothing on his behalf over the next eight months, and, in the interims following their termination, defendant was twice without counsel for a total of almost six months. Neither defendant nor the defender general would have faced difficulty in finding available and effective counsel, however, had defendant not contrived to disqualify counsel and delay trial in the first place. That defendant did not want trial is further reflected by his similar obstruction in the newer habitual-offender case when, again faced with an imminent trial date eighteen months later, defendant first attempted to have his lawyer dismissed as overworked and unprepared, and, failing in that ploy, then forced a mistrial and disqualification of counsel by ensnaring his lawyer in some fraud upon the court.

¶ 60. Also missing from the majority's narration is defendant's express waiver of speedy-trial rights in February 2002, after declining two opportunities to go to trial. The majority intones that defense counsel should not be forced to trial without reasonable preparation, but there is no evidence or findings to support defendant's claim that he had to forfeit trial rather than proceed unprepared. The trial court rejected his lawyer's argument that documents and new witnesses still to be sought were necessary to the defense. This judge's decision has not been challenged.

¶ 61. After his waiver, defendant made no demand for speedy trial. Nevertheless, the majority recites several times, but erroneously, that defendant "repeatedly and adamantly demanded to be tried." *Ante*, ¶ 38. Defendant is fond of claiming that he repeatedly asserted his right to trial, but the record shows that he did not. Instead, defendant filed serial motions to dismiss the case or dismiss his counsel, but never actually demanded a prompt trial. It is long settled that motions to dismiss for lack of speedy trial are no substitute for demanding an expedited trial. *State v. Keith*, 160 Vt. 257, 268, 628 A.2d 1247, 1254 (1993); *State v. French*, 152 Vt. 72, 77, 564 A.2d 1058, 1061 (1989); *State v. Unwin*, 139 Vt. 186, 196, 424 A.2d 251, 257 (1980). This is because

---

[5] As argued by the State when contesting defendant's efforts to discharge his second assigned counsel in this case, the older felony docket presented still three other incidents of defendant's pattern of seeking dismissal of counsel or continuances when confronted with trial dates.

defendants, like this defendant, could otherwise move for dismissal without being themselves prepared for trial. *Unwin*, 139 Vt. at 196, 424 A.2d at 257 (recognizing that "[a] demand for a trial would require that the defense be prepared.").

¶ 62. Denying one of these later motions to dismiss, the trial court noted that

> [d]efendant's current counsel has not demanded trial nor indicated that she is ready for trial . . . . This court remains ready to schedule jury draw and trial within a reasonable time of . . . counsel's demand for same.

Despite this invitation, no such request for trial was forthcoming. This finding also remains unchallenged.

¶ 63. Similarly, the majority's concern that delay in this case may have been due to inadequate public-defender resources is unsupported by the record. While the defender general obviously had trouble finding counsel during the fourteen months following defendant's threat to his second lawyer, this difficulty appeared no more attributable to lack of resources than to ordinary conflicts of interest, attorney retirement, contract modification, and defendant's own misconduct. None of the delay was shown to be caseload related. Defendant claimed so, or said his lawyers claimed as much, but proved none of it. Two lawyers were disqualified due to conflicts, while defendant forced two others off the case by his own behavior. Another assigned counsel quit the practice of criminal law and yet another withdrew due to a contract change. Cases cited by the majority addressing speedy-trial violations arising from overcrowded courts or overburdened public defenders are not particularly enlightening on this record that shows that defendant deliberately passed up two different trial dates, squandered another, and forced the discharge of three prepared court-appointed lawyers.

## The *Barker* Test

¶ 64. To determine a speedy trial violation, we must consider and balance the four factors laid out by the Supreme Court in *Barker*: (1) the length of the delay; (2) reasons for the delay; (3) whether defendant asserted his rights; and (4) prejudice to defendant. 407 U.S. at 530. If any rule governs speedy-trial analysis, it is that there is no absolute standard. "[T]he right to speedy trial is a more vague concept than other procedural rights.

It is, for example, impossible to determine with precision when the right has been denied." *Id.* at 521. Thus, we are required to approach this case on an ad hoc basis as to the consequence of delay upon the constitutional interests behind the right to speedy trial: prevention of oppressive pretrial detention, minimization of pretrial anxiety of the accused and limitation of the impairment of the defense. *Id.* at 532. "Of these, the most serious is the last [factor], because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

### Length of Delay

¶ 65. This was not a case where the court acceded to stagnation. Knowing that two of defendant's other cases had slowed due to problems with available lawyers, the court advanced defendant to trial in the parallel habitual-offender felony case that was not mired in conflicts with counsel. Since the shortage of lawyers was, in large part, precipitated by defendant, and it was unlikely that defendant would have been preparing for two life-penalty felony trials simultaneously had he but one counsel, the hiatus here while counsel prepared for trial in the other serious case was not material.

¶ 66. Delay of fourteen months is presumptively prejudicial, but not grounds to dismiss per se. An even longer delay would not entitle defendant to the majority's "get-out-of-jail-free" card under the Speedy Trial Clause. See *Barker*, 407 U.S. at 534 (holding that five-year delay attributable to prosecution, including ten months of incarceration, was extraordinary, but did not justify writ of habeas corpus for lack of speedy trial when defendant acquiesced to three years of delay without prejudice); see also *Moore v. Arizona*, 414 U.S. 25, 28 (1973) (holding that a three year delay warranted remand for an assessment, under *Barker*); *State v. Percy*, 158 Vt. 410, 420, 612 A.2d 1119, 1126 (1992) (rejecting claim of per se speedy-trial violation where trial court inaction for eleven months contributed to twenty-eight months passing between reversal of original conviction and retrial). "[P]resumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria . . . ." *Doggett v. United States*, 505 U.S. 647, 656 (1992). Given defendant's repeated efforts to postpone trial in this case for almost two years, the absence of prejudice, and the court's countervailing efforts to get to trial in the companion case only to be sabotaged by defendant, the lengthy delay attributable

to the defender general carries little, if any, weight against the state.

### Cause of Delay

¶ 67. Inattention to defendant's right to speedy trial "is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense." *Id.* at 657. It was defendant who alienated and disqualified one lawyer on the brink of trial in this case, and again alienated and disqualified another lawyer who was ready for trial four months later. If defendant had not so deliberately delayed the instant matter, the defender general would not have been faced with finding yet another counsel to assign. Having twice duly provided defendant with counsel and opportunity to proceed to trial, the weight of subsequent delay in finding another counsel falls only lightly on the state. Already a light burden due to mere negligence, as opposed to design, the weight against the state is slighter still considering defendant's repeated instigation of delay.

### Assertion of Right

¶ 68. Defendant's failure to demand trial was no waiver of speedy trial indefinitely, but is still a factor in evaluating his claim of deprivation. *Barker*, 407 U.S. at 528. Given the trial court's unassailed finding that defendant made no such assertion, this factor cannot weigh in his favor. Defendant's consistent actions to dismiss his lawyers and delay trial belie his purported interest in either. "It is incumbent on defendant to assert his right to a speedy trial in order to obtain reversal here as a result of delay." *State v. Roy*, 151 Vt. 17, 37, 557 A.2d 884, 896 (1989) (noting *Barker* Court's emphasis that " 'failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial' ") (quoting *Barker*, 407 U.S. at 532)). Defendant's demonstrated disinterest in speedy trial weighs against him.

### Prejudice

¶ 69. The presumptive prejudice of the delay attributable to the state is not conclusive, but rebuttable. *Doggett*, 505 U.S. at 658 (noting that where the presumed prejudice "is neither extenuated, as by the defendant's acquiescence, . . . nor persuasively rebutted, the defendant is entitled to relief"). Except for claiming that the memory of one witness was compromised and the address of

another witness was lost by the passage of time, defendant failed to proffer evidence that the Sixth Amendment's protection against oppressive confinement, pretrial anxiety or impairment of the defense were prejudiced by delay in this case.

¶ 70. The trial court correctly rejected the impaired-defense claim as unfounded. The testimony that would have resulted from the allegedly failing memory of one witness would have been excluded on evidentiary grounds unrelated to delay, while defendant's bald assertion, that unspecified "exculpatory information" was lost when the witness's address was lost, lacked any basis in the record. On appeal, defendant complains about these rulings, but offers no explanation as to why the court was wrong on the facts or the law. Following the majority's admonition that "even moderately speculative claims of evidentiary prejudice must be given careful consideration," *ante*, ¶ 48, the trial court's denial of this claim is still supported by the record. Recollected or not, the statement sought from the witness was inadmissible hearsay. The claimed, but never identified, exculpatory evidence was not moderately speculative, but purely speculative.

¶ 71. It is not at all evident how the defender general's fourteen-month delay, sandwiched in the middle of defendant's twenty-two month prolongment of this case, was otherwise prejudicial. We are concerned that "[i]nordinate delay . . . may seriously interfere with . . . defendant's liberty . . . and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends," *Moore*, 414 U.S. at 27 (quotation omitted), but none of these fears were realized here. We know that defendant twice preferred continued incarceration to an opportunity for trial and acquittal more than twenty-four months earlier. Defendant argued no greater anxiety or oppression in his jail time during the delays attributable to the defender general than from the eleven months of jail time wasted by defendant in forcing his lawyers off the case, or the eleven months of jail time accumulated while his new attorney requested extensions and prepared for trial. Considering defendant's contribution to the extra delay and his demonstrated lack of interest in speedy trial, any extra incarceration attendant to difficulty in securing replacement counsel seems not so oppressive, and carries little weight against the state.

¶ 72. The delay attributable to the defender general proved simply immaterial to some of defendant's pretrial detention.

Commencing April 11, 2003, defendant was held, regardless of any delay, for over twenty-one months for lack of $6,000 bail in the companion cases. Thus, the delay attributable to the defender general in this case from April 11 until appearance of new counsel on August 1, 2003, had nothing to do with his continued incarceration during that time, reducing the potential prejudice of delay-related pretrial detention to ten months at worst. In contrast, absent other significant attending prejudice, four years of delay, including ten months pretrial detention, was of insufficient weight to warrant release of a convicted defendant in *Barker*, 407 U.S. at 534.

¶ 73. The majority too easily dismisses as speculative the State's point that defendant would have remained incarcerated on the other charges regardless of the delay here. Defendant's ongoing detention regardless of the delay attributable to the defender general was not speculative, but certain. Defendant turned down the trial court's invitation for reconsideration of its hold-without-bail order. Unable to make the modest bail imposed in his other pending dockets, the issue of defendant's continued pretrial detention after assignment of the new counsel was moot. In any event, ten months of pretrial detention attributable to delay cannot, by itself, be reason to reverse on Sixth Amendment grounds. *Id.*

¶ 74. Nor was financial hardship, domestic disruption or public disgrace at risk for defendant. According to his public defender application, defendant was unemployed and without significant assets at the time of his arrest. Court records show that defendant's former domestic partner, the victim in the pending prosecutions, secured multiple relief-from-abuse orders against him prohibiting defendant from contacting her and limiting parent-child contact. Defendant's chronic criminality was already a matter of public record showing fourteen prior convictions, including felonies for obstructing justice, concealing stolen property and, at age thirty-one, sexual assault of a minor, so that defendant's public ignominy was achieved well before, and was hardly exacerbated by, any delay in this case.

¶ 75. Defendant failed to prove the prejudice claimed, and otherwise failed to allege any particular prejudice, real or possible, resulting from delay in this case. The majority properly clarifies our caselaw to acknowledge that actual impairment of the defense is not the ultimate test for a Sixth Amendment violation. See

*Moore*, 414 U.S. at 26-27 (recognizing that actionable "prejudice to a defendant caused by delay . . . is not confined to the possible prejudice to his defense"). Prejudice can arise from unnecessary incarceration, disruption of finances or family, shame, or anxiety. *Id.* at 27. Nevertheless, and however characterized, "[a] showing of prejudice *is* required to establish a violation of the Sixth Amendment Speedy Trial Clause, and that necessary ingredient is entirely missing here." *Reed v. Farley*, 512 U.S. 339, 353 (1994) (emphasis added).

¶ 76. Thus, none of the speedy-trial factors mandated for our review by *Barker* require reversal of this conviction and dismissal of the charge against defendant. The length of delay in securing effective counsel was unfortunate, but not per se prejudicial. The government twice fulfilled its obligation to secure representation for defendant and to proceed to a timely trial before defendant created further delay in his case. But for defendant's repeated tactics to disqualify his lawyers and delay trial there would have been no difficulty in finding substitute counsel, so the defender general was not the primary cause of delay. Defendant neither proved nor actually pled any imposition on reputation, relationship, or peace of mind. Even assuming that defendant sustained natural anxiety or disruption from being charged and imprisoned pending trial in this case, it was not enough to deter defendant from twice manufacturing delay of trial to pass up the opportunity for acquittal and release in this matter. Nor does defendant distinguish the burdens of incarceration in this case from the same burdens presumably arising from being simultaneously held for lack of bail in the companion cases. Most significantly, under *Barker*, this delay caused no impairment to the defense. 407 U.S. at 533 (discussing the prevention of impairment to the defense as the "most serious" interest protected by the speedy trial clause). Accordingly, the factor of prejudicial impact, in any of its various forms, carries no weight against the state.

¶ 77. Wanting the case dismissed, defendant just as clearly did not actually *want* a speedy trial. Defendant waived and then failed to assert his right to speedy trial, while his consistent efforts to avoid trials confirmed his disinterest in going to trial. "More important than the absence of serious prejudice, is the fact that [defendant] did not want a speedy trial." *Id.* at 534.

¶ 78. The majority glosses over the foregoing facts and prefers to grant relief based on as yet unproven allegations of prejudice

caused by neglectful delay in assigning counsel. Based on the record, defendant's complaints are unsupported at best, and contrary to the evidence at worst. If the attorneys forced off the case by defendant were incompetent, ineffective, or unprepared, or if defendant sustained any prejudice from delay, we cannot know from the record before us. Relying on our precedent, now overturned, see *ante*, ¶¶ 40-42, the trial court ended its post-trial inquiry once it was evident that defendant failed to assert his speedy-trial rights and that, whatever its length and cause, the delay had no actual adverse impact to the defense. The full spectrum of balancing length of delay, cause of delay and other potential prejudices as required by *Barker* was not completed below.

¶ 79. The record supports the conclusion that defendant is not entitled to relief. The court's initial ruling that trial would proceed over defendant's protestations of unpreparedness is not challenged. In his other motions to dismiss below, and in this appeal, defendant repeats his lament about unprepared lawyers, but nowhere specifies how the trial court erred in its rejection of this claim. On the record before us, even without considering defendant's similar obstructions of trial in his companion dockets, defendant failed to demonstrate any of the prejudices upon which *Barker* would require dismissal for lack of speedy trial. On the same record, defendant failed to show that the length of delay was more egregious than much longer delays deemed not to require dismissal under *Barker*. On that record, defendant failed to tip the remaining *Barker* factors in his favor; he did not show why his own contributions to the delay were outweighed by the state's, or that he asserted his speedy-trial right — or that he even wanted a speedy trial — all as required by *Barker* as a precondition to relief.

¶ 80. The most significant facts found by the majority — that the state, rather than defendant, was responsible for two years of delay, that defendant had no choice but to disrupt his trial schedule because his lawyers were unprepared, and that he repeatedly asserted his right to speedy trial and was prejudiced as a result of delay — were neither found below nor supported by the record here. If the trial court's denial of the motion to dismiss cannot be sustained by the *Barker* factors on the available record, although I believe it can be, the case cannot be dismissed without the necessary *Barker* findings of prejudice, cause of delay, and whether defendant indeed sought and was denied a speedy trial.

¶ 81. Finally, before affording defendant release and dismissal of the charges based on assumptions premised on nothing but his purported version of events, the State should have an opportunity for rebuttal. Otherwise, we surrender control to those more invested in avoiding jury verdicts than in vindicating the right to speedy trial. As the Supreme Court recognized in *Barker*, speedy trial is often not a defendant's friend. 407 U.S. at 521 (observing that "[d]elay is not an uncommon defense tactic" as "witnesses . . . become unavailable or their memories . . . fade"). The majority's procession to judgment without the evidence necessary to actually confirm its perception that the *Barker* factors preponderate against the state, or its assumption, against the evidence, that delay prejudiced the defendant, can only encourage dilatory tactics by jailhouse lawyers and others interested in subverting the trial court.

¶ 82. If the majority finds the trial court's *Barker* analysis deficient, the proper remedy is to remand for the necessary evidentiary proceedings where privilege can be waived and the readiness and tactics of defendant's attorneys, as well as defendant's tactics and his intentions regarding speedy trial, can be more fully explored. Otherwise, while the record supports rejection of the claimed speedy-trial violation under *Barker*, there are insufficient facts or evidence in the record to support the majority's assumption that defendant should be freed. Since no Sixth Amendment grounds presently justify endangering the public by the unnecessary discharge of this habitual felon, I dissent, and am authorized to state that Chief Justice Reiber joins in this dissent.